DAYLE ELIESON
United States Attorney
District of Nevada

HOLLY VANCE
Assistant United States Attorney
Bruce R. Thompson Federal Building and U.S. Courthouse
400 S. Virginia Street, Suite 900
Reno, Nevada 89501
Phone: (775) 754-5438
Facsimile: (775) 784-5181
Holly.A.Vance@usdoj.gov

JEFFREY H. WOOD
Acting Assistant Attorney General
U.S. Department of Justice
Environment and Natural Resources Division

DANIELA A. ARREGUI, Trial Attorney
Environment & Natural Resources Division
Natural Resources Section
P.O. Box 7611
Washington, D.C. 20044
Tel. (202) 305-0447
Fax (202) 305-0506
daniela.arregui.labarca@usdoj.gov

DEVON LEA FLANAGAN, Trial Attorney
Environment & Natural Resources Division
Natural Resources Section
P.O. Box 7611
Washington, D.C. 20044
Tel. (202) 305-0201
Fax (202) 305-0275
devon.flanagan@usdoj.gov

*Attorneys for Defendants*

i

# UNITED STATES DISTRICT COURT
## DISTRICT OF NEVADA

|  |  |
|---|---|
| FRIENDS OF ANIMALS, | ) |
| | ) |
| Plaintiff, | ) |
| v. | ) |
| | ) |
| JILL SILVEY, in her official capacity as the | ) |
| Elko District Office Manager; and THE | ) |
| UNITED STATES BUREAU OF LAND | ) |
| MANAGEMENT, an agency of the United | ) |
| States, | ) |
| Defendants. | ) |

No. 3:18-cv-00043-LRH-VPC

**DEFENDANTS' REPLY BRIEF
IN SUPPORT OF CROSS-MOTION
FOR SUMMARY JUDGMENT**

ii

# TABLE OF CONTENTS

PAGE

INTRODUCTION ..................................................................................................... 1

ARGUMENT ............................................................................................................ 1

A.  The 2017 Gather Plan Complied with BLM Policy and Reasonably Explained The Ten-Year Time Period. ........................................................................................ 1

B.  A Multi-Year Gather Decision Does Not Violate the WHA or NEPA. .............................. 5

C.  BLM's Excess Determination Was Based on Current Information. ................................... 7

D.  BLM's Reliance on the Most Current AMLs Was Not Arbitrary or Capricious ................. 8

E.  The 2017 Gather Plan Complies With the WHA's Requirement For Minimal Feasible Management and the Maintenance of Free-Roaming Behavior. ..................................... 10

F.  BLM was Not Required to Prepare an EIS Because the 2017 Gather Plan Complied with NEPA by Providing a Thorough and Reasoned Analysis. ............................................ 12

  1.  The Nature and Effects of the Gather Plan Were Adequately Analyzed ................. 12

  2.  Wild Horses Are Not Historic or Cultural Resources ................................... 15

  3.  The 2017 Gather Plan is Incapable of Establishing Precedent .................................. 15

  4.  The 2017 Gather Plan Does Not Violate Any Other Law .......................................... 16

G.  BLM Took a Hard Look at the Impacts of the Proposed Action. ................................. 16

  1.  BLM Sufficiently Analyzed Possible Effects and Impacts to Geldings Based on Currently Available Studies ........................................................................ 16

  2.  BLM Took a Hard Look at the Genetic Diversity of the Complexes ......................... 17

H.  BLM Analyzed a Reasonable Range of Alternatives and Adequately Responded to Public Comments. ............................................................................................. 18

CONCLUSION ...................................................................................................... 20

# TABLE OF AUTHORITIES

<u>CASES</u>                                                                                                <u>PAGE</u>

*All. for the Wild Rockies v. Zinke*,
  265 F. Supp. 3d 1161 (D. Mont. 2017)................................................................ 4
*Am. Horse Prot. Ass'n v. Andrus*,
  460 F. Supp. 880 (D. Nev. 1978)...................................................................... 11
*Am. Horse Prot. Ass'n v. Frizzell*,
  403 F. Supp. 1206 (D. Nev. 1975)................................................................. 5, 6
*Am. Horse Prot. Ass'n v. Watt*,
  694 F.2d 1310 (D.C. Cir. 1982)................................................................... 7, 9
*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986)...................................................................................... 16
*Ariz. Cattle Growers' Ass'n v. Salazar*,
  606 F.3d 1160 (9th Cir. 2010)........................................................................ 12
*Balt. Gas & Elec. Co. v. Nat. Res. Def. Council*,
  462 U.S. 87 (1983)........................................................................................ 17
*Barnes v. U.S. Dep't. of Transp.*,
  655 F.3d 1124 (9th Cir. 2011) ....................................................................... 15
*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007)...................................................................................... 10
*Cal. Trout v. F.E.R.C.*,
  572 F.3d 1003 (9th Cir. 2009) ....................................................................... 16
*California v. Block*,
  690 F.2d 753 (9th Cir. 1982) ......................................................................... 18
*Cloud Found. v. BLM*, No. 3:11-cv-00459-HDM-VPC,
  2013 WL 1249814 (D. Nev. Mar. 26, 2013) ..................................................... 9
*Colo. Wild Horse & Burro Coal., Inc. v. Jewell*,
  130 F. Supp. 3d 205 (D.D.C. 2015) ............................................................... 13
*Crutchfield v. Cty. of Hanover*,
  325 F.3d 211 (4th Cir. 2003) ..................................................................... 5, 15
*Ctr. for Biological Diversity v. Kempthorne*,
  588 F.3d 701 (9th Cir. 2009) ........................................................................ 14
*Ctr. for Biological Diversity v. Zinke*,
  868 F.3d 1054 (9th Cir. 2017) ........................................................................ 4
*Ctr. for Envtl. Law & Policy v. U.S. Bureau of Reclamation*,
  655 F.3d 1000 (9th Cir. 2011) ........................................................................ 6
*Ecology Ctr. v. Castaneda*,
  574 F.3d 652 (9th Cir. 2009) ........................................................................ 17
*Envtl. Prot. Info. Ctr. v. U.S. Forest Serv.*,
  451 F.3d 1005 (9th Cir. 2006) ....................................................................... 13

*Friends of Animals v. BLM*,
  232 F. Supp. 3d 53 (D.D.C. 2017) ............................................................... 3
*Friends of Animals v. Haugrud*,
  236 F. Supp. 3d 131 (D.D.C. 2017) ......................................................... 3, 4
*Friends of Animals v. Sparks*,
  200 F. Supp. 3d 1114 (D. Mont. 2016) ....................................................... 9
*Hernandez v. Spacelabs Med., Inc.*,
  343 F.3d 1107 (9th Cir. 2003) ................................................................... 16
*In Def. of Animals v. U.S. Dep't of the Interior*,
  751 F.3d 1054 (9th Cir. 2014) ........................................................... passim
*Kern v. BLM*,
  284 F.3d 1062 (9th Cir. 2002) ..................................................................... 6
*Long Island Care at Home, Ltd. v. Coke*,
  551 U.S. 158 (2007) .................................................................................... 5
*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
  463 U.S. 29 (1983) ........................................................................ 5, 15, 18
*Robertson v. Methow Valley Citizens Council*,
  490 U.S. 332 (1989) .................................................................................. 12
*Russell v. Pac. Motor Trucking Co.*,
  672 F. App'x 629 (9th Cir. 2016) ............................................................. 10
*Selkirk Conservation All. v. Forsgren*,
  336 F.3d 944 (9th Cir. 2003) ....................................................................... 6
*Skidmore v. Swift & Co.*,
  323 U.S. 134 (1944) .................................................................................. 12
*W. Radio Servs. v. Espy*,
  79 F.3d 896 (9th Cir. 1996) ......................................................................... 4

STATUTES

16 U.S.C. § 1333(b)(1) ................................................................................... 11
16 U.S.C. § 1333(b)(2) ........................................................................... 6, 7, 8
16 U.S.C. § 1333(b)(3) ................................................................................... 11
16 U.S.C. § 1333(b)(2) ..................................................................................... 6

FEDERAL REGULATIONS

40 C.F.R. § 1501.4 ........................................................................................... 6
40 C.F.R. § 1502.20 ....................................................................................... 13
40 C.F.R. § 1502.9(c)(1) .................................................................................. 8
40 C.F.R. § 1508.27(b)(4) ............................................................................. 13
40 C.F.R. § 1508.27(b)(10) ........................................................................... 16
43 C.F.R. § 46.310(a) .................................................................................... 18

**LIST OF ABBREVIATIONS**

| AML | Appropriate Management Level |
|---|---|
| APA | Administrative Procedure Act |
| BLM | Bureau of Land Management |
| EA | Environmental Assessment |
| EIS | Environmental Impact Statement |
| FONSI | Finding of No Significant Impact |
| HMA | Herd Management Area |
| NAS | National Academy of Sciences |
| NEPA | National Environmental Policy Act |
| PZP | Porcine zona pellucida contraceptive vaccine |
| GonaCon | GonaCon-Equine |
| RMP | Resource Management Plan |
| WHA | Wild Free-Roaming Horses and Burros Act |

**INTRODUCTION**

Contrary to Plaintiff's characterizations, Defendants have not asserted "absolute" discretion or alleged that U.S. Bureau of Land Management ("BLM") decisions are unreviewable. *See* Pl.'s Combined Opp'n to Defs.' Cross-Mot. for Summ. J. & Reply in Supp. of Mot. for Summ. J. 1, ECF No. 30 ("Pl.'s Reply").  BLM's reasonable decision to remove excess wild horses and apply population controls in the Antelope and Triple B Herd Management Area ("HMA") Complexes, consistent with the requirements of the Wild Free-Roaming Horses and Burros Act ("WHA"), easily falls within BLM's well-established discretion to manage wild horse populations. Plaintiff ignores the deference warranted for BLM management decisions and instead argues that every management decision must be based on essentially perfect information: no scientific uncertainty regarding any project impacts and population counts, environmental monitoring, and appropriate management levels ("AMLs") that are immediately updated prior to every round-up of wild horses.  Perfect information is almost never available when predicting future environmental effects and is not required by the WHA or the National Environmental Policy Act ("NEPA"). Requiring this perfect data before any decision-making would hamstring BLM's ability to take necessary actions.  With limited resources and dire situations in numerous HMAs, as well as on private lands, BLM must be able to act based on the currently available information, as it has done here and as the WHA expressly permits.  BLM has complied with the WHA, NEPA, and internal BLM policies and chosen a reasonable method for addressing the massive overpopulation in the Antelope and Triple B HMA Complexes that negatively affects the range environment, public health and safety, local landowners, livestock grazing, and the health of the wild horses themselves.  Plaintiff has not demonstrated that BLM's decision was arbitrary and capricious or inadequately analyzed under NEPA.

**ARGUMENT**

**A.      The 2017 Gather Plan Complied with BLM Policy and Reasonably Explained The Ten-Year Time Period.**

Plaintiff's argument that BLM violated the Administrative Procedure Act ("APA") by failing to provide a sufficiently reasoned explanation for departing from previous BLM policy fails

1

for numerous reasons.  *See* Pl.'s Reply at 1-4.  First, the 2017 Gather Plan complied with BLM's handbook and policies.  Second, even if BLM departed from the handbook, the handbook itself is not a legally binding document.  But, in any event, BLM did provide a reasoned basis for issuing its multi-year gather plan and that determination should be upheld.

BLM complied with its handbook and land use plans in issuing the 2017 Gather Plan. Contrary to Plaintiff's allegations, BLM's determination that the Antelope and Triple B Complexes contained excess wild horses was based on all the factors the handbook suggested should inform an excess determination.  *See* Pl.'s Mot. for Summ. J. & Mem. of P. & A. 9-10, ECF No. 21 ("Pl.'s Opening Br."); AR 15004 (BLM handbook provision listing factors).  Defendants' cross-motion and response brief explained, with citations to the record, how BLM addressed each of the excess determination factors listed in the BLM handbook.  Defs.' Cross-Mot. for Summ. J. & Mem. of P. & A. 8, ECF No. 27 ("Defs.' Resp.") (explaining with citations to the record). Plaintiff's reply brief does not even address this argument, let alone identify which factors it believes BLM failed to address.  *See* Pl.'s Reply 1-4.  BLM clearly complied with the handbook in issuing its excess determination.

Additionally, BLM's use of a single Environmental Assessment ("EA") for a series of gathers did not run afoul of BLM's handbook or land use plans.  *See id.* at 2-4.  Nowhere in the handbook does it dictate that BLM must issue a *separate* EA for every individual gather or round-up.  Plaintiff suggests that the mere fact that the handbook uses the singular form of "gather" when stating that a gather decision should be issued thirty-one to seventy-six days prior to the "proposed gather start" means that BLM is *forbidden* from analyzing more than one gather in a single NEPA document.  *Id.* at 3 (citing AR 15033).  However, Plaintiff has no basis for reading such a broad rule into the use of a singular noun.  The handbook did not specifically discuss preparing a single EA for a series of related gathers, but does state that future gathers may be able to rely upon

previous NEPA documents as long as the action was "adequately analyzed" under NEPA—clearly demonstrating that Plaintiff's one-EA-for-one-gather rule is not BLM policy. *See* AR 15034.[1]

The land use plans cited by Plaintiff, *see* Pl.'s Reply 3, likewise do not address this issue, but merely state that "[e]nvironmental assessments will be prepared prior to any gatherings," AR 25777, and a "gather plan will be approved for each gather," AR 30173.[2]  These statements simply mean that BLM cannot conduct a gather without analyzing it in a gather plan and NEPA document first.  Here, each and every gather authorized by the 2017 Gather Plan has been analyzed in the Gather Plan and EA, and therefore comply with BLM policy.  If the BLM land use plans were intended to require a *separate* gather plan or EA for each gather, they would have and could have stated that.  Additionally, BLM complied with the handbook by issuing its 2017 Gather Plan and Decision Record fifty days (between thirty-one and seventy-six days) prior to the start of the gathers approved in that plan, providing Plaintiff with an opportunity for administrative review on every gather covered by the plan (an opportunity Plaintiff has availed itself of with this very lawsuit).  *See* AR 15033; Defs.' Resp. 11-12; *contra* Pl.'s Reply 1.

The D.C. District Court addressed the precise issue raised by Plaintiff here and determined that Plaintiff's argument that BLM must issue "an EA, or some other document formally identified in NEPA regulations, for every individual gather . . . reads too much into BLM's guidance and prior statements."  *Friends of Animals v. BLM*, 232 F. Supp. 3d 53, 63 (D.D.C. 2017).  Plaintiff ignores this case and instead relies on an inapposite case that presented a different factual situation, *Friends of Animals v. Haugrud*, 236 F. Supp. 3d 131 (D.D.C. 2017).  *See* Pl.'s Reply 2-3.  In *Haugrud*, BLM's Decision Record authorized only a single gather of 167 horses, although it

---

[1] In addition to complying with the handbook, BLM did not depart from agency norms or common practices by authorizing a multi-year plan.  As explained in Defendants' response brief, BLM has issued multi-year gather plans on numerous occasions.  *See* Defs.' Resp. 10, 22.  Plaintiff falsely assumes, without directly alleging or proving, that BLM's decision departs from prior practice, but cites no previous gather plans where separate EAs conducted for a series of related gathers.

[2] Additionally, Plaintiff has waived these arguments because Plaintiff's Complaint does not provide notice of the now-asserted claim that BLM failed to comply with land use plans by issuing a single EA for a phased gather plan.  *See* Defs.' Resp. 13.

referenced future gathers in the area.  *Haugrud,* 236 F. Supp. 3d at 133-34.  The D.C. District Court rejected the plaintiff's challenge to future gathers as unripe because additional NEPA analysis would be required for any future gather not authorized in the Decision Record.  *Id.* at 135. That case did not address the validity of a Decision Record such as the one here that indisputably authorized multiple gathers to take place over a period of years.  *Haugrud* should not be read to set forth a rule regarding a situation not presented to that court.

Even if BLM had departed from the handbook's non-binding guidelines, which it clearly did not, the Ninth Circuit has stated that it "will not review allegations of noncompliance with an agency statement that is not binding on the agency."  *W. Radio Servs. v. Espy*, 79 F.3d 896, 900 (9th Cir. 1996); *see also* Defs.' Resp. 11-12.  Plaintiff ignores this standard and instead asserts that BLM faces some heightened requirement to explain its alleged departure from the handbook. Plaintiff cites no cases in which a court applied such a standard to an agency's departure from a non-binding guidance document.  Plaintiff instead relies on cases where the agency issued a new policy document allegedly changing its interpretation of a statutory term for all future decisions, *All. for the Wild Rockies v. Zinke,* 265 F. Supp. 3d 1161, 1181 (D. Mont. 2017), or where the agency changed its position between the draft and final decision documents, *Ctr. for Biological Diversity v. Zinke*, 868 F.3d 1054, 1060-61 (9th Cir. 2017), neither of which is analogous to this case.  Pl.'s Reply 2.  Finally, Plaintiff cites *Humane Society of the U.S. v. Locke*, where the Ninth Circuit held that the agency's decision was *not* "an unexplained 'swerve' from 'prior precedent'" triggering "a duty to explain a departure from precedent" when the conclusion of the EA being reviewed in that case seemed at odds with previous EAs.  626 F.3d 1040, 1050 n.4 (9th Cir. 2010); *see* Pl.'s Reply 2.

Moreover, BLM did provide a reasoned explanation both for doing multiple gathers and for issuing one multi-year decision covering those gathers.  The EA reasons that "gather efficiencies and holding space during the initial gather would not allow" BLM to successfully capture and remove enough excess wild horses to achieve low AML.  AR 20.  The EA also explained that "[f]ollow-up gathers over a 10 year period" will be "necessary in order to achieve and maintain the low range of AML, and[]to gather a sufficient number of wild horses as to

implement the population control component of the Proposed Action . . . ."  AR 20.  Thus, BLM's reasons for proposing a gather plan involving multiple gathers are clear from the record.  The EA, as it must, analyzes the potential environmental effects of the proposed action.  AR 8.

Finally, Defendants' defense of the multi-year gather plan is not an impermissible "post hoc rationalization."  Pl.'s Reply 3.  BLM's rationale for issuing a multi-year gather plan decision "may reasonably be discerned" from the record.  *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).  Additionally, the Court may consider Defendants' purely legal arguments responding to Plaintiff's claims.  *See Crutchfield v. Cty. of Hanover*, 325 F.3d 211, 219-20 (4th Cir. 2003) (agency's argument as to the applicability of its regulations was not a post hoc rationalization even though agency did not cite to the regulation in the record; issue was a "pure question of law" rather than "the reasoning by which an agency seeks to justify its actions"); *cf. Long Island Care at Home, Ltd. v. Coke*, 551 U.S. 158, 171 (2007) (considering an agency's interpretation of regulatory requirements "even if the agency set those views forth in a legal brief").  BLM had no reason nor obligation to address every possible future legal challenge to its decision in the record, particularly in response to claims that lack legal merit (as demonstrated by Defendants' briefs).

**B.     A Multi-Year Gather Decision Does Not Violate the WHA or NEPA.**

Nothing in the WHA or NEPA forbids BLM from issuing a gather plan authorizing several gathers to remove and manage an excess wild horse population.  *See In Def. of Animals v. U.S. Dep't of the Interior*, 751 F.3d 1054, 1065 & n.16 (9th Cir. 2014) (noting BLM's discretion to remove excess animals from an HMA); *Am. Horse Prot. Ass'n v. Frizzell*, 403 F. Supp. 1206, 1217 (D. Nev. 1975).  And contrary to Plaintiff's accusations, *see* Pl.'s Reply 4-5, BLM has issued similar multi-year gather plans in the past, *see* Defs.' Resp. 10, 22.  Plaintiff asserts that no court has upheld a multi-year gather decision against a challenge that it necessarily violates NEPA or the WHA, but this is only because one has not been squarely challenged on those grounds.  *See* Pl.'s Reply 5.  The fact that a common agency practice has not been challenged in court certainly does not render the process illegal.

Additionally, BLM was required by the WHA to removal excess wild horses once it made the excess and removal determination, and reasonably decided to do so with a single Gather Plan. Plaintiff's assertion that "BLM is not required to remove wild horses immediately *when population numbers exceed the AML*" misses the point.  *Id.* (emphasis added).  BLM *is* required to immediately remove wild horses after it has made a determination that excess horses are present and must be removed.  16 U.S.C. § 1333(b)(2).  BLM made such a determination in this case.  AR 369.  That determination was made based on a consideration of "all information currently available" to the agency, 16 U.S.C. § 1333(b)(2), which demonstrated a massive overpopulation of roughly 8,626 wild horses in the Antelope and Triple B Complexes that was degrading the environment, endangering public safety, and harming landowners and livestock grazers.  *See* Defs.' Resp. 4, 8.  After BLM rendered this reasonable excess and removal determination, supported by ample evidence in the record, it was required by law to remove the "excess animals from the range so as to achieve appropriate management levels."  16 U.S.C. § 1333(b)(2).  A decision to conduct only one gather and remove only a small fraction of the excess wild horses with no plan to achieve AML, as Plaintiff proposes, would violate this WHA requirement.

Once BLM made its excess and removal determination and developed the plan required by the WHA to achieve AML as immediately as could be reasonably achieved, NEPA required BLM to analyze the potential effects of its proposed action—as it did here.  *See* 40 C.F.R. § 1501.4. Contrary to Plaintiff's assertions, Pl.'s Reply 6, NEPA does not require an agency to subdivide its proposed action and analyze it piecemeal.  In fact, NEPA encourages agencies to look at the full picture of its proposed action and consider cumulative effects.  *See Ctr. for Envtl. Law & Policy v. U.S. Bureau of Reclamation*, 655 F.3d 1000, 1007 (9th Cir. 2011).  Additionally, NEPA requires agencies to address potential future impacts, even if it requires predicting effects years in the future when surrounding circumstances may change.  *See Selkirk Conservation All. v. Forsgren*, 336 F.3d 944, 962 (9th Cir. 2003) (NEPA requires an agency to "engage in reasonable forecasting" and some "speculation is . . . implicit in NEPA" (quoting *Kern v. BLM*, 284 F.3d 1062, 1072 (9th Cir. 2002) (alteration in original))).

6

1   **C.      BLM's Excess Determination Was Based on Current Information.**

2           BLM issued its excess determination based on the current available data, which is

3   consistent with the WHA.  Plaintiff's argument that BLM's future gathers under the 2017 Gather

4   Plan will not be based on information has no basis in the WHA and is factually inaccurate.

5   *See* Pl.'s Reply 7.

6           The WHA directs the Secretary of Interior, acting in this case through BLM, to decide, "*on

7   the basis of whatever information he has at the time of his decision*, that an overpopulation exists."

8   *Am. Horse Prot. Ass'n v. Watt*, 694 F.2d 1310, 1318 (D.C. Cir. 1982); *see also* 16 U.S.C. §

9   1333(b)(2).  What matters is the information available at the time of the decision, i.e. the Decision

10  Record, not at some future point.  In compliance with this requirement, BLM issued its excess

11  determination based on the currently available data.  Now that an excess determination has been

12  made, BLM must remove the excess wild horses to achieve AML, even if doing so takes several

13  years.  16 U.S.C. § 1333(b)(2).

14          Notably, BLM's Decision Record authorized the gather of excess wild horses and the

15  application of population control measures to achieve AML in the Complexes, not to remove an

16  exact number of wild horses.  AR 365-66.  This decision mirrors the requirements of the WHA,

17  16 U.S.C. § 1333(b)(2), and allows BLM to adjust the exact number of wild horses removed to

18  account for future population inventories and resource monitoring.  *See* AR 20 (providing for

19  monitoring every two to three years).  BLM could also take into account any adjustments to AMLs

20  in the project area.  Finally, BLM will determine if any future gathers conducted pursuant to the

21  2017 Gather Plan require some additional NEPA analysis or are fully covered by the EA and

22  Finding of No Significant Impact ("FONSI").  *See* AR 238 (noting that BLM will conduct any

23  necessary NEPA analysis regarding the precise sites chosen for traps or temporary holding

24  facilities used to implement the 2017 Gather Plan); AR 15034 (if existing NEPA documentation

25  is not adequate, BLM may be required to conduct a new NEPA analysis).  For instance, NEPA

26  requires BLM to supplement an EA if "[t]he agency makes substantial changes in the proposed

27  action that are relevant to environmental concerns" or "[t]here are significant new circumstances

28

1    or information relevant to environmental concerns and bearing on the proposed action or its

2    impacts." 40 C.F.R. § 1502.9(c)(1).

3    **D.    BLM's Reliance on the Most Current AMLs Was Not Arbitrary or Capricious.**

4          BLM's decision satisfies the WHA because it was based on existing AMLs and no

5    amendment to the AMLs was necessary or required.  The WHA requires BLM to make excess

6    determinations "on the basis of all information currently available." 16 U.S.C. § 1333(b)(2).  And

7    numerous cases have made clear that "nothing in the [WHA] requires the BLM to determine new

8    AMLs based on current conditions every time the BLM decides to take action to restore the

9    already-established AMLs." *In Def. of Animals*, 751 F.3d at 1064 n.13; *see* Defs.' Resp. 14.

10         While the AMLs relied on in the EA have not been amended in the past few years, they are

11   the currently applicable, established AMLs for the HMAs in the project area and therefore BLM

12   was required to rely upon them.  BLM also affirmed that recent monitoring data did not warrant

13   an amendment to any of the AMLs at the time of its decision.  AR 34.  None of the land use plans

14   Plaintiff cites suggest that the AMLs are now invalid or obsolete.  Pl.'s Reply 8-9.  First, the 1998

15   Spruce Final Multiple Use Decision ("Spruce FMUD") refers to a reevaluation of the Spruce and

16   Valley Mountain grazing allotments four years after full implementation of the final grazing

17   system, primarily to "make any necessary adjustments in grazing use." AR 25151.  This provision

18   does not contemplate a reevaluation of any AMLs.  *See* Defs.' Resp. 16.  Plaintiff's Reply cites a

19   different portion of the Spruce FMUD referencing the parameters for future "allotment

20   evaluations," *see* Pl.'s Reply 9, which are a specific type of evaluation conducted on all allotments

21   and differs from the narrower reevaluation expected to occur after four years.  The cited provision

22   states that when allotment evaluations are completed for all of the grazing allotments in the

23   Antelope Valley HMA, "a total AML for the HMA will be determined." AR 25172.  BLM has

24   complied with this commitment: a total AML for the Antelope Valley HMA was determined once

25   allotment evaluations had been completed on all of the relevant allotments.  *See* AR 24494, 24578.

26         Second, even if the 2008 Ely District Approved Resource Management Plan ("2008 Ely

27   RMP") and 1993 Wells RMP Wild Horse Amendment stated that they would be invalid if not

28   reevaluated every five years—which neither of them did, *see* Defs.' Resp. 15-16—both *have been*

reevaluated in the past five years.  *See* AR 19828-19842 (2014 reevaluation of the Wells RMP); Exhibit A (2014 reevaluation of the 2008 Ely RMP).[3]  Contrary to Plaintiff's allegations, the 2014 reevaluation of the Wells RMP evaluated all amendments that had been incorporated into that RMP, including the 1993 Wells RMP Wild Horse Amendment.  *See* AR 19828 (listing the relevant amendments).  And while the reevaluation concluded that some amendment of the Wells RMP is warranted, it did not state that the Wells RMP was instantaneously or automatically invalid or should not be relied upon pending that revision, nor did it determine that the *AMLs* were outdated or in need of revision.  AR 19841-19842.  RMP revisions can take several years, and BLM is under no obligation to delay action to remedy the dire overpopulation in the Antelope and Triple B Complexes because of the possibility that an amendment to one of the AMLs may occur in the future.  Indeed, BLM is obligated to render its excess determination based on currently available information, regardless of its alleged imperfections.  *See, e.g.*, *Cloud Found. v. BLM*, No. 3:11-cv-00459-HDM-VPC, 2013 WL 1249814, at *5 (D. Nev. Mar. 26, 2013) ("BLM's findings of wild horse overpopulations should not be overturned quickly on the ground that they are predicated on insufficient information." (quoting *Watt*, 694 F.2d at 1318)).

Plaintiff's reliance on *Friends of Animals v. Sparks*, 200 F. Supp. 3d 1114 (D. Mont. 2016), is misplaced.  Pl.'s Reply 8.  The reasoning in *Sparks* clearly does not apply to this case because BLM has complied with all of the commitments to reevaluate its land plans and create a total AML for the Antelope Valley HMA.  *See also* Defs.' Resp. 16 (explaining that *Sparks* is distinguishable because it hinged on the fact that BLM had to recalculate AMLs, which the court interpreted to require BLM to issue a new agency decision amending the AML, as opposed to merely evaluate a plan, which may not result in any amendments to the plan or changes to the AMLs).

Thus, Plaintiff has failed to demonstrate that BLM's reliance on the current AMLs for the project area was arbitrary or capricious.

---

[3] Defendants intended to attach the 2008 Ely RMP reevaluation to its response and cross-motion, *see* Defs.' Resp. 15 n.7, but inadvertently neglected to submit it with the filing.  This exhibit will be correctly filed with this brief, in case it will aid the Court's review.

**E.      The 2017 Gather Plan Complies With the WHA's Requirement For Minimal Feasible Management and the Maintenance of Free-Roaming Behavior.**

As explained in Defendants' response brief, Plaintiff's claims that BLM's planned use of gelding violates the WHA were not properly pled in their Complaint and cannot be raised in summary judgment briefing. *See* Defs.' Resp. 17. In response to this argument, Plaintiff points to facts alleged in its Complaint regarding gelding. Pl.'s Reply 9-10. However, Plaintiff does not address Defendants' primary point: that it raises only one WHA *claim* in its Complaint, and that was a challenge to the excess determination, not the decision to use gelding as a management tool. *See* Compl. ¶¶ 116-18, ECF No. 1. The Complaint clearly failed to put Defendants on notice of these newly pursued claims. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *Russell v. Pac. Motor Trucking Co.*, 672 F. App'x 629, 631 (9th Cir. 2016).

Even if properly pled, these claims fail as a legal matter because the 2017 Gather Plan complies with the WHA's requirement for minimal feasible management and maintains the free-roaming behavior of the wild horses in the Antelope and Triple B Complexes. Plaintiff reads far more into the terms "minimal feasible level" and "free-roaming" than the statute or common sense permits. First, WHA's requirement that "[a]ll management activities shall be at the minimal feasible level" means that BLM shall use "[t]he minimum number of habitat or population management tools or actions necessary to attain the objectives" for an HMA or HMA complex. AR 15043. BLM complied with these requirements, as returning horses that would already be gelded back to the range does not increase the number of population management actions that BLM must take and gelding provides a permanent way to render part of the herd non-reproducing. *See* Defs.' Resp. 17-18. Plaintiff confuses NEPA requirements with those of the WHA, suggesting that the WHA provision does not permit "controversial" management actions or any that have not been thoroughly studied. Pl.'s Reply 10. This goes far beyond the definition of "minimal feasible level," any interpretation of that term by courts, or the plain meaning of the WHA provision.

Similarly, Plaintiff tries to import, with no legal basis, a wide range of wild horse behaviors into the term "free-roaming." Plaintiff claims that BLM's definition of "free-roaming" as "able to

10

move without restriction by fences or other barriers within an HMA," AR 15042, somehow contradicts the legislative history of the WHA, which states:

> Reliance on ranges, and particularly fenced ranges, would defeat the purpose of the legislation, i.e., the survival of wild free-roaming horses and burros, and substitute a 'zoo-like' concept. The conferees are of the opinion that the confinement of these animals to such ranges, except in unusual circumstances, should be discouraged and that the animals should be considered as integral parts of the public lands, which should be administered on concepts of multiple use.

*Am. Horse Prot. Ass'n v. Andrus*, 460 F. Supp. 880, 882 (D. Nev. 1978), *aff'd in part and vacated in part*, 608 F.2d 811 (9th Cir. 1979). However, this language seems to reinforce BLM's interpretation that "wild free-roaming horses and burros" means those that are not in "fenced ranges" or constrained in "zoo-like" pens. *Id.* Plus, the plain meaning of the language support this reading: "roam" means "to travel purposefully unhindered through a wide area." *See* "Roam," Merriam-Webster's Dictionary. On the other hand, Plaintiff cites no basis for interpreting "free-roaming" to include all natural behaviors, including reproductive behaviors that the WHA explicitly permits curtailing in 16 U.S.C. § 1333(b)(1), or behaviors such as "congregat[ing] in larger numbers," which has nothing to do with the ability to roam freely. Pl.'s Reply 10-11. In fact, Plaintiff's broad reading of the term contradicts the WHA, which explicitly authorizes BLM to use "sterilization, or natural controls on population levels" on wild free-roaming horses. 16 U.S.C. § 1333(b)(1); *see also In Def. of Animals*, 751 F.3d at 1066. Thus, the statute clearly contemplates that a wild horse can remain "free-roaming" even without exhibiting natural reproductive behaviors.

Plaintiff's last ditch effort to justify this claim faults BLM's definition of "free-roaming" as contradicting Congress's intention. Contrary to Plaintiff's characterization, the National Academy of Sciences ("NAS") Report on which it relies was not "directed by Congress," Pl.'s Reply 11, but was commissioned by BLM, AR 14153, 14154.[4] Nor would a report commissioned

---

[4] Plaintiff cites 16 U.S.C. § 1333(b)(3), a WHA provision which directs the Secretary to have a report conducted by NAS on or before January 1, 1983. This multi-phased study was completed in 1982, and is not the 2013 NAS Report found in the record. *See* AR 14171 (citing the reports completed to satisfy Congress's mandate).

by Congress necessarily speak for Congress in its results, unless adopted through legislation. Finally, the study does not put forth a definition of "free-roaming" that contradicts BLM's. It merely states that gelding could be counter to the "public interest in maintaining natural behaviors" in wild horses, not that it would contradict the WHA or render the horses no longer "free-roaming." AR 14293.

BLM's definition warrants some level of deference. *See Skidmore v. Swift & Co.*, 323 U.S. 134, 139-40 (1944); *Ariz. Cattle Growers' Ass'n v. Salazar*, 606 F.3d 1160, 1165 (9th Cir. 2010) (affording deference to an agency handbook's definition of a statutory term). Because BLM's definition is reasonable, consistent with the legislative history, and faithful to the plain meaning of the statutory terms, it should not be rejected by the Court in favor of Plaintiff's broad and baseless alternative. Plaintiff's claims that gelding wild horses violates the WHA's provisions regarding the "minimal feasible level" of management or maintaining "free-roaming" wild horses therefore must fail.

**F.    BLM was Not Required to Prepare an EIS Because the 2017 Gather Plan Complied with NEPA by Providing a Thorough and Reasoned Analysis.**

**1.    The Nature and Effects of the Gather Plan Were Adequately Analyzed**

Contrary to Plaintiff's hollow allegations, the record provides ample evidence that the proposed action poses no significant environmental effects. Defs.' Resp. 19-21. The Decision Record and FONSI clearly state that upon a review of the Final EA, including a review of the impacts of the proposed action, BLM concluded that the gather would not significantly affect the quality of the human environment and therefore it did not need to prepare an EIS. AR 365-373. BLM complied with the procedural requirements of NEPA by analyzing environmental effects, as described in over 150 pages of the record. AR 37-195; *see Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350-51 (1989). Plaintiff may disagree with BLM's conclusion; however, BLM's informed conclusion was based on current data and studies.

First, Plaintiff erroneously relies on *American Wild Horse Preservation Campaign v. Perdue* to allege BLM is required to draft a NEPA document for public comment to address the corrected acreage included in the Final EA. 873 F.3d 914, 930 (D.C. Cir. 2017). *Perdue* did not

hold that an EIS is required whenever plan boundaries change; it instead held that the boundary change was not significant for purposes of the Forest Management Act. *Id.* The D.C. Circuit did find that the Forest Service had a duty to engage in reasoned decisionmaking and analyze the potential environmental significance of removing 23,000 acres from a territory plan, and found a NEPA violation because the Forest Service never addressed the departure from past practice and never analyzed the potential environmental significance of removing the 23,000 acres from the plan. *Id.*

 As previously addressed, while the preliminary EA had used incorrect acreage, the Final EA used the correct acreage, as established under each HMA's land use plan. *See* Defs.' Resp. 20-21; AR 354 (Antelope Valley), 355 (Goshute), 358 (Maverick-Medicine), and 360 (Spruce-Pequop). Plaintiff's argument that BLM was required to analyze how the correct acreage "could affect the wild horses, their ability to range freely, the amount of forage available to them, and the publics [*sic*] ability to view them" is unsupported and contrary to legal precedent. Pl.'s Reply 12. Because BLM did not change the acreage in the governing land use plans, BLM is not required to re-analyze issues previously addressed in its land use plan NEPA analysis. *See Colo. Wild Horse & Burro Coal.*, *Inc. v. Jewell*, 130 F. Supp. 3d 205, 215 (D.D.C. 2015) (NEPA "encourages agencies to 'tier'" analysis to "eliminate repetitive discussions of the same issues") (citation omitted); 40 C.F.R. § 1502.20. Yet even with Plaintiff's erroneous standard, BLM analyzed the environmental consequences of the acreage change between the Preliminary and Final EA. *See* Defs.' Resp. 20-21; AR 10, 351-364.

 Second, comments received opposing the proposed action fail to demonstrate that a substantial dispute exists as required by NEPA. 40 C.F.R. § 1508.27(b)(4), (5); *Compare* Defs.' Resp. 22-26, *with* Pl.'s Reply 12-14. Plaintiff simply disagreed with BLM's expertise and informed conclusion. However, when specialists express conflicting views, courts defer to the informed discretion of BLM. *Envtl. Prot. Info. Ctr. v. U.S. Forest Serv.*, 451 F.3d 1005, 1017 (9th Cir. 2006); *In Def. of Animals*, 751 F.3d at 1071.

 Third, BLM has been managing wild horse populations for decades and agency deference is particularly warranted concerning population management. BLM has developed management

13

expertise for the past two decades in "the application of contraceptives treatments and adjusting sex ratios to achieve and maintain wild horse populations within the established AML." AR 9; *see also* Defs.' Resp. 22-23. Plaintiff's claim that there is no evidence of the effects of fertility control is baseless and contrary to the record. Pl.'s Reply 13-14. The use of fertility controls have long been used by BLM. Contrary to Plaintiff's accusation, BLM never ignored the 2013 NAS Report or comments received by the public. Pl.'s Reply 13; *see* AR 152-53, 270-350, 14138-14588. The 2013 NAS Report, considered by BLM and included in the record, specifically described "[t]he most promising fertility-control methods for application to free-ranging horses or burros." AR 14158; *see also* AR 155-165, 165-176. Notably, the NAS Report found chemical vasectomy most promising despite unknown side effects of the procedure, which has never been studied on wild horses. AR 14160 ("Only surgical vasectomy has been studied in horses, so side effects of the chemical agent are unknown."). The NAS Report does not support Plaintiff's argument that effects of castration are uncertain or disputed.

Lastly, Plaintiff fails to demonstrate a substantial dispute about the nature and effects of the BLM's contemplated return of some geldings to skew the sex ratio of the core breeding population. Pl.'s Reply 13. Not all uncertainty warrants an EIS. *Ctr. for Biological Diversity v. Kempthorne*, 588 F.3d 701, 712 (9th Cir. 2009). Here, BLM has studied and continues to study effects of gelding wild stallions, and in its expertise can "reasonably predict[]" the likely outcome of gelding a portion of the population. *Id.* at 712; *see also* Defs.' Resp. 25 n.12. BLM also adequately responded to public comments received regarding impacts of gelding. AR 287-315; Defs.' Resp. 25-27. Plaintiff's reference to *Anderson v. Evans*, a case about whales, is not instructive. Pl.'s Reply 13 (citing 371 F.3d 475, 490-91 (9th Cir. 2004)). Unlike wild horses within a metapopulation, whales have a particular fidelity to specific locations, which could deplete local populations if there were an unregulated take. *See infra* discussion Section G.2. While the Ninth Circuit found that the take of 2.5 whales could have a potential impact to the local population, the return of some geldings would not result in a non-reproducing herd or eliminate social behaviors. AR 150 (scientific modeling determined that a population with more than 85%

geldings would be necessary for population suppression or potential genetic consequences), 151 (report noting that domestic horse geldings exhibit aggression and sexual behaviors).

## 2. Wild Horses Are Not Historic or Cultural Resources

Plaintiff's allegation that the proposed action may have a significant impact on cultural and historical resources, specifically wild horses, is unsupported and contrary to NEPA.  Pl.'s Reply 14.  In its response to public comments, BLM clearly explained that the WHA does not describe or define wild horses as cultural resources.  AR 310-11.  "Research regarding the wild horse as part of the historic cultural landscape revealed that wild horses are not discussed in historic and pioneer journals, indicating their presence and impact on that [historic] environment . . . was minimal, if present at all."  AR 311.  Thus, BLM's rationale that wild horses cannot constitute a cultural resource is apparent from the record.  *See Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43 (courts will uphold a decision if the agency's path may reasonably be discerned).  And as discussed above, Defendants' defense of the 2017 Gather Plan through legal arguments is not an impermissible "post hoc rationalization."  *See supra* Section A; Pl.'s Reply 14; *Crutchfield*, 325 F.3d at 219-20.

## 3. The 2017 Gather Plan is Incapable of Establishing Precedent

Plaintiff's allegation that the 2017 Gather Plan will set precedent for future actions lacks merit and any legal or factual support.  *Compare* Pl.'s Reply 15, *with* Defs.' Resp. 21-22.  The Final EA expressly states that the proposed action would *not* set a precedent.  *S*ee AR 376.  The EA is site-specific to the Triple B and Antelope Complexes and legally incapable of creating binding precedent in this jurisdiction.  *In Def. of Animals*, 751 F.3d at 1071; *Barnes v. U.S. Dep't. of Transp.*, 655 F.3d 1124, 1140 (9th Cir. 2011).  Plaintiff's allegation that the proposed action "will essentially be a study to set precedent for other management actions" is unfounded.  Pl.'s Reply 15.  BLM regularly collects information for actions as a management tool.  Monitoring is a management tool regularly used by BLM.  For example, Standard Operating Procedures for mares treated with PZP include freeze-marking to help identify the animals for future treatment and assess the efficacy of the fertility control treatment.  AR 21, 217-218.  Therefore, monitoring geldings returned to range under the proposed action is not any different than the routine practice of freeze-marking and monitoring of mares.  AR 221-222.

1       Plaintiff fails to provide any legal support that size or scope are determining factors that

2  trigger an EIS.  Plaintiff's allegation that "BLM has never used an EA" to manage wild horses

3  "covering several HMAs, millions of acres of lands, and a ten-year time period" is false.  Pl.'s

4  Opening Br. 19; *see supra* Sections A-B; Defs.' Resp. 21-22.  Plaintiff seems paralyzed by the

5  acreage and number of horses on the Complexes; however, the Ninth Circuit Court of Appeals has

6  held that size is not a determining factor.  *See In Def. of Animals*, 751 F.3d at 1070.

7      **4.**    **The 2017 Gather Plan Does Not Violate Any Other Law**

8       Plaintiff's vague allegation that the proposed action violates other laws is unsupported.

9  Pl.'s Reply. 16.  Plaintiff "cannot defeat summary judgment with allegations in the complaint, or

10  with unsupported conjecture or conclusory statements." *See Hernandez v. Spacelabs Med., Inc.*,

11  343 F.3d 1107, 1112 (9th Cir. 2003) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-

12  52 (1986)); *see also* Fed. R. Civ. P. § 56(c), (e).  The 2017 Gather Plan complied with the APA,

13  WHA, NEPA, and BLM policy, all of which have been addressed.  *See* Defs.' Resp. 6-11, 14-16,

14  19-21, 24-25.  The 2017 Gather Plan does not violate other laws, *see* 40 C.F.R. § 1508.27(b)(10)

15  (NEPA intensity factor requiring consideration if an "action threatens a violation of a Federal,

16  State, or local law or requirements imposed for the protection of the environment"), and Plaintiff

17  has not shown otherwise.  *See* Pl.'s Opening Br. 20-21; Pl.'s Reply 16.  Nor is it BLM's burden to

18  decipher unsupported allegations and what "other laws" Plaintiff suspects have been violated

19  which it has failed to properly plead.

20  **G.**    **BLM Took a Hard Look at the Impacts of the Proposed Action.**

21      **1.**    **BLM Sufficiently Analyzed Possible Effects and Impacts to Geldings Based**
             **on Currently Available Studies**

22

23       BLM provided thorough and reasoned explanations, throughout the record, addressing the

24  impacts of the proposed action's gelding component based on current studies.  *See* Defs.' Resp.

25  25-27; AR 148-154, 287-340; *supra* Section F.1.  BLM is not required to recite its assessment,

26  consideration, and response to every comment on an EA with the same degree as it does for an

27  EIS.  *See Cal. Trout v. F.E.R.C.*, 572 F.3d 1003, 1016 (9th Cir. 2009).  And even in a more

28  comprehensive EIS, agencies "need not respond to every single scientific study or comment."

*Ecology Ctr. v. Castaneda*, 574 F.3d 652, 668 (9th Cir. 2009).   Contrary to Plaintiff's allegation, the mere possibility of unknown effects does not render BLM's conclusion unfounded or arbitrary and capricious.

While Plaintiff relies on *AWHC v. Zinke* for the proposition that an EIS is required, it fails to acknowledge that the proposed action in *AWHC v. Zinke* contemplated managing an *entirely* non-reproducing herd, which is starkly different than the case at hand.   BLM is proposing to manage the HMAs at their established AML range, with one component including the return of geldings to the range.   The herd as a whole will continue to reproduce and the effect on the individual geldings was thoroughly analyzed.   AR 146-177.   BLM took the requisite hard look by analyzing possible effects and impacts to geldings based on the currently available science.   BLM further analyzed the individual effects on the geldings and disclosed the surgical procedure, possible complications, and anticipated effect that "free roaming wild horse geldings would exhibit reduced aggression toward other horses and reduced reproductive behaviors."   AR 148.   The NAS Report identified the same potential effects in both surgical and chemical castration but did not discount castration as a management tool.   AR 14293.   BLM's informed conclusion to return some geldings as a component of the proposed action is neither arbitrary nor capricious based on the existing data.   *See Balt. Gas & Elec. Co. v. Nat. Res. Def. Council*, 462 U.S. 87, 105-06 (1983).

### 2.     BLM Took a Hard Look at the Genetic Diversity of the Complexes

Plaintiff's allegation that BLM failed to take a hard look at the impacts of the proposed action on the genetic diversity of the Complexes is not supported by the record.   Pl.'s Reply 17-18.   As previously discussed, the Antelope and Triple B Complexes are managed as metapopulations, meaning that wild horses interchange throughout the HMAs, thereby increasing genetic diversity.   Defs.' Resp. 26-27.   Notably, the NAS Report deemed metapopulations to be the preferred method of managing wild horses.   *See* AR 14161 (NAS Report finding that the "[m]anagement of equids as a metapopulation is necessary for the long-term genetic health of horses and burros at the HMA or HMA-complex level").   "Few HMAs are large enough to buffer the effects of genetic drift and herd sizes must be maintained at prescribed AMLs."   *Id.*   It is undisputed that these Complexes are of the size contemplated by the NAS Report, spanning

approximately 2.8 million acres with a combined AML range of 899-1,678 wild horses.  AR 10-11; Defs.' Resp. 4.  While genetic diversity could be maintained by the established AMLs, these Complexes are grossly overpopulated, with approximately 8,626 excess wild horses on the range. AR 14, 369; Defs.' Resp. 4-5.

BLM's rationale for concluding that the proposed action would not have adverse effects to the genetic diversity of the herds is apparent from the record and is not a post hoc rationalization. *See Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43.  None of the genetic reports BLM consulted concluded that genetic variability was at risk under the governing AML range for each HMA.  AR 30194-30275; Defs.' Resp. 26-27.  BLM also adequately responded to comments regarding genetic viability of wild horses in the Complexes by noting that the breeding population size would be greater than needed to maintain genetic diversity.  AR 275, 276, 278-279, 287-294, 298, 299-302, 319-320, 333.  BLM further has a longstanding practice of genetic monitoring in the HMAs, in accordance with the BLM handbook, to ensure that herds maintain adequate genetic diversity.  AR 29, 153-154, 299, 14986-15065.

## H.   BLM Analyzed a Reasonable Range of Alternatives and Adequately Responded to Public Comments.

Plaintiff repeatedly ignores evidence in the record clearly showing BLM gave due consideration to proposed alternatives, even though Plaintiff's alternatives were outside of the scope of the gather analysis.  Defs.' Resp. 27-29.  BLM gave a good faith, reasoned analysis in its response to public comments, and that is all that NEPA requires.  *See* Defs.' Resp. 29; AR 270-350; *see also California v. Block*, 690 F.2d 753, 773 (9th Cir. 1982) (stating that an agency's obligation to respond to public comments is limited); 43 C.F.R. § 46.310(a) (minimum requirements for an EA do not include responses to comments).  BLM complied with NEPA by analyzing an appropriate range of reasonable alternatives.  The alternatives proposed by Plaintiff were both unreasonable and short-sighted, with the sole aim to ensure more wild horses than optimal remain on a degraded range.

First, Plaintiff's allegation that BLM failed to consider reevaluating the AMLs as a reasonable alternative is false.  Pl.'s Reply 18-19.  BLM concluded that "[m]onitoring data

collected within the Complexes does *not* indicate that an increase in AML is warranted at this time." AR 34; Defs.' Resp. 15.  Despite not being required to conduct a new AML determination prior to each decision, BLM evaluated monitoring data to reach the informed conclusion that an increase in AML was not appropriate. *See In Def. of Animals*, 751 F.3d at 1064 n.13.  Thus, BLM considered the alternative but reasonably eliminated it from analysis.  AR 33-34.

Second, BLM reasonably eliminated the alternative of managing wild horses through natural means.  Defs.' Resp. 28-29.  BLM correctly concluded that management by natural means was not a reasonable alternative because it had not been feasible in the past and would result in less forage, poorer body condition, and decreased survival of wild horses.  AR 35-36.  These conclusions were also affirmed by the NAS.  AR 36.

Third, Plaintiff fails to provide factual or legal support that BLM failed to analyze the alternative of reducing livestock grazing.   As previously discussed, numerous areas of the Complexes are not currently used for livestock grazing as BLM has coordinated with ranchers to reduce grazing over the past decade.  Defs.' Resp. 4; AR 58-63, 13734, 28161-180, 26506-15. BLM found that even significantly reducing levels of livestock would still result in insufficient habitat for the current wild horse populations that are eleven times higher than low AML.  AR 33, 365; Defs.' Resp. 29.   Plaintiff does not explain how this alternative would meet the statutory objective of attaining a thriving natural ecological balance as required by the WHA.  Pl.'s Reply 19-20.  Though Plaintiff's alternative did not address the purpose of the action, BLM nevertheless appropriately addressed and rejected its alternative.

Lastly, Plaintiff falsely claims BLM ignored public comments.  Pl.'s Reply 13.  BLM thoroughly addressed comments in its responses in Appendix IX and the effect analysis.  AR 41-189, 270-350.  The agency also responded to comments for each of the alternatives proposed by Plaintiff.  AR 287-295, 302-306; Defs.' Resp. 25-26.  BLM is not required to explain why it relied on the studies referenced in the EA or record, as opposed to the studies preferred by Plaintiff, but did carefully consider and respond to comments, including those offered by Plaintiff.  AR 270-350.  In doing so, and in reaching its decision, BLM met all the requirements of NEPA, and Plaintiff cannot show the decision was arbitrary or capricious.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## CONCLUSION

For the foregoing reasons, the Court should deny Plaintiff's motion for summary judgment, and grant Defendants' cross-motion for summary judgment on all claims.

DATED: June 21, 2018.

Respectfully submitted,

JEFFREY H. WOOD
Acting Assistant Attorney General

*/s/ Devon Lea Flanagan*
DEVON LEA FLANAGAN
Trial Attorney, D.C. Bar No. 1022195
Wildlife and Marine Resources Section
Environment & Natural Resources Division
P.O. Box 7611
Washington, D.C. 20044
Tel. (202) 305-0201
Fax (202) 305-0275
devon.flanagan@usdoj.gov

DANIELA A. ARREGUI
Trial Attorney, New York Bar No. 4714713
Natural Resources Section
Environment and Natural Resources Division
United States Department of Justice
P.O. Box 7611
Washington, D.C. 20044
Tel. (202) 305-0447
Fax (202) 305-0506
daniela.arregui.labarca@usdoj.gov

*Attorneys for Defendants*

[additional counsel listed on cover page]

20

# INDEX OF EXHIBITS

**A.**    **Exhibit A** - Reevaluation Report for Ely District RMP (2014)

## CERTIFICATE OF SERVICE

I hereby certify that on June 21, 2018, I electronically filed the foregoing with the Clerk of the Court for the United States District Court for the District of Nevada by using the CM/ECF system, which will serve a copy of the same on the counsel of record.

*/s/ Devon Lea Flanagan*
DEVON LEA FLANAGAN
Trial Attorney, D.C. Bar No. 1022195
Wildlife and Marine Resources Section
Environment & Natural Resources Division
P.O. Box 7611
Washington, D.C. 20044
Tel. (202) 305-0201
Fax (202) 305-0275
devon.flanagan@usdoj.gov

22