1
2
3
4
5
6                    UNITED STATES DISTRICT COURT

7                        DISTRICT OF NEVADA

8                                * * *

9   FRIENDS OF ANIMALS,

10                 Plaintiff,

11         v.                                    Case No. 3:18-cv-0043-LRH-(WGC)

12                                               ORDER
    JILL C. SILVEY, in her official capacity as
13  Bureau of Land Management Elko District
    Manager; and THE UNITED STATES
14  BUREAU OF LAND MANAGEMENT,

15                 Defendants.
16

17         Before the Court is plaintiff Friends of Animals' ("FOA")[1] motion for summary judgment.

18  (ECF No. 21). Defendants, the United States Bureau of Land Management ("BLM") and Jill Silvey

19  ("Silvey"),[2] filed an opposition and cross-motion for summary judgment. (ECF No. 27). FOA then

20  filed a response (ECF No. 30) to which defendants replied (ECF No. 33). On October 29, 2018,

21  the court held a hearing on the parties' cross-motions for summary judgment and a similar motion

22  in a companion case.[3] For the reasons stated below, the Court will deny FOA's motion for

23  summary judgment and grant defendants' motion for summary judgment.

24

25  ─────────────────
    [1] Friends of Animals is a non-profit international advocacy organization that, through its Wildlife Law
26  Program, advocates on behalf of wildlife in the United States legal system.
    [2] Defendant Silvey is the manager for the Elko District of the BLM.
27  [3] The companion case, *American Wild Horse Campaign v. Zinke* (3:18-CV-00059-LRH-CBC), concerns
    the same action undertaken by BLM, but FOA challenges it on different grounds. Additionally, although
28  the plaintiffs in both cases contest the same action, the administrative records are different. As such, the
    Court will issue two separate orders dispensing with both sets of motions for summary judgment.

                                          1

# I. Factual and Procedural Background

This action concerns the BLM's approved plan to gather, round-up, and permanently remove approximately 9,000 wild horses from the Antelope and Triple B wild horse complexes ("Antelope and Triple B Complexes") located in southeastern Elko County and northern White Pine County, Nevada pursuant to the Wild Free-Roaming Horses and Burros Act ("WHBA"), 16 U.S.C. §§ 1331 *et seq.*

The BLM oversees and administers the Antelope and Triple B Complexes alongside the wild horses which call the complexes home. The Antelope Complex is composed of the Antelope Herd Management Area ("HMA"),[4] the Antelope Valley HMA, the Goshute HMA, and the Spruce-Pequop HMA. The Triple B Complex is composed of the Triple B HMA, the Maverick-Medicine HMA, and the Cherry Springs Wild Horse Territory. Together, these two wild horse complexes comprise over 2.8 million acres of public land managed by BLM.

In February 2016 and March 2017, BLM conducted wild horse population inventories throughout the Antelope and Triple B Complexes. (Administrative Record ("AR") at 365). As a result of those inventories, BLM determined there were roughly 9,525 wild horses then residing in the complexes and that wild horses were beginning to migrate outside of designated HMAs and were encroaching upon private land for forage and water. (*Id.*) The previously determined Appropriate Management Levels ("AML")[5] for wild horse populations in the Antelope and Triple B Complexes is between 899 horses on the low range and 1,678 horses on the high range. (AR at 11). Thus, at the time of the inventories, the total wild horse population on the complexes was

---

[4] A Herd Management Area is an area of public land wherein wild horse populations reside and are overseen by BLM. Each HMA has a specific geographic boundary and is unique in its terrain features, local climate, and natural resources, and, as such, is uniquely administered by BLM. Currently, BLM manages over 177 separate HMAs across 10 western states with 83 of BLM's HMAs in Nevada.

[5] An Appropriate Management Level is an expressed wild horse population range for a designated HMA with both an upper and lower limit, within which BLM manages wild horse populations. *See Am. Wild Horse Pres. Campaign v. Jewell*, 847 F.3d 1174, 1178 (10th Cir. 2016). An AML range is determined after taking into account various factors of a particular HMA including terrain, climate, natural resources and the ability of the HMA to sustain a wild horse population. "In each HMA, BLM officials are afforded significant discretion to compute [AMLs] for the wild horse populations they manage." *Fund for Animals, Inc. v. BLM*, 460 F.3d 13, 16 (D.C. Cir. 2006). Further, the purpose of an AML is "to move towards a thriving natural ecological balance," and an AML is used as "a trigger by which the BLM is alerted to address population imbalance." *In Def. of Animals v. U.S. Dept. of Interior*, 751 F.3d 1054, 1063-64 (9th Cir. 2014).

2

eleven times greater than low AML and nearly six times greater than high AML. Based on this information, BLM determined that in Spring 2017, there were over 9,000 excess wild horses living in the complexes and that a gather to remove the excess wild horses was required under the WHBA to bring the wild horse population back within the AML range for the Antelope and Triple B Complexes.

Initially, defendants compiled a preliminary gather plan and Environmental Assessment ("EA") for gathering and removing excess wild horses from the complexes known as The Preliminary Antelope and Triple B Complexes Gather Plan EA, DOI-BLM-NV-N030-2017-0010-EA. The preferred action under the preliminary plan was to gather and permanently remove approximately 6,700 wild horses from the complexes over a ten-year period, utilize population and fertility controls on a portion of the remaining wild horse population, adjust the sex ratio of the wild horse population within the HMAs, and manage a portion of the male wild horse population as castrated geldings. The preliminary gather plan was made available for public review and comment from July 21 through August 21, 2017. (AR at 196, 370). During this period, BLM received approximately 4,940 comment submissions,[6] including a comment from FOA.[7] (AR at 370).

After the close of the public comment period, defendants prepared a final gather plan and environmental assessment in December 2017: The Antelope and Triple B Complexes Gather Plan EA, DOI-BLM-NV-E030-2017-0010-EA ("2017 Gather Plan"). (AR at 1–364). On December 21, 2017, defendants issued a final Decision Record approving the proposed gather, removal, and fertility controls outlined in Alternative A of the 2017 Gather Plan.[8] (AR at 365–

---

[6] Although the BLM received almost 5000 comments during the public comment period, the Court notes that 97% of those submissions (more than 4,780 of the public comments) were form letters simply opposing the preliminary gather plan. *See* AR at 1626–13698.

[7] FOA submitted its own comment during the public comment period in which it claimed that the preliminary gather plan failed to fully consider the environmental impacts of BLM's proposed action. FOA also presented three alternative action plans for management of the wild horse populations that did not include removal of wild horses from the Antelope and Triple B Complexes.

[8] Approved Alternative A of the 2017 Gather Plan authorizes the BLM to: (1) gather and remove approximately 9,053 excess wild horses from the Antelope and Triple B Complexes to achieve a core breeding population at low AML; (2) administer population control measures including the use of fertility drugs to reduce fertility in mares; (3) adjust the sex ratios of wild horse populations to achieve a 60% male ratio within the core breeding population; and (4) return a portion of newly gelded male horses to the

373). Also on December 21, 2017, defendants issued a Finding of No Significant Impact ("FONSI") for the 2017 Gather Plan, finding that "implementation of [the 2017 Gather Plan] will not significantly affect the quality of the human environment" and, therefore, "preparation of an Environmental Impact Statement ("EIS") [was] not required as per Section 102(2)(C) of the National Environmental Policy Act ("NEPA")." (AR at 374–377).

On January 25, 2018, FOA filed a complaint against defendants alleging five separate causes of action: (1) violation of the Administrative Procedures Act ("APA"), 5 U.S.C. §§ 701-706; (2) violation of the WHBA; (3) violation of NEPA for failing to prepare an Environmental Impact Statement; (4) violation of NEPA for failing to consider and address reasonable alternatives to the 2017 Gather Plan; and (5) violation of NEPA for failing to take a "hard look" at the environmental impact of the 2017 Gather Plan. (ECF No. 1). On January 31, 2018, BLM conducted the first roundup under the 2017 Gather Plan removing roughly 1,300 wild horses from the Triple B Complex and then returning 62 horses to the complex including 28 mares treated with fertility controls.

## II. Legal Standard

Summary judgment is appropriate only when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show "that there is no genuine issue as to any material fact and that the [moving party] is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). In assessing a motion for summary judgment, the evidence, together with all inferences that can reasonably be drawn therefrom, must be read in the light most favorable to the party opposing the motion. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Cnty of Tuolumne v. Sonora Cmty. Hosp.*, 236 F.3d 1148, 1154 (9th Cir. 2001).

The moving party bears the burden of informing the court of the basis for its motion, along with evidence showing the absence of any genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). On those issues for which it bears the burden of proof, the moving party

---

complexes to bring the total wild horse population to mid-range AML. (AR at 20–21, 365–6). Further, because gather efficiencies and available holding space would make it impossible for BLM to gather approximately 9,053 excess wild horses in a single gather, Alternative A of the 2017 Gather Plan is structured to allow for a series of roundups and population control methods over a ten-year period. *Id.*

4

must make a showing that is "sufficient for the court to hold that no reasonable trier of fact could find other than for the moving party." *Calderone v. U.S.*, 799 F.2d 254, 259 (6th Cir. 1986).

To successfully rebut a motion for summary judgment, the non-moving party must point to facts supported by the record which demonstrate a genuine issue of material fact. *Reese v. Jefferson Sch. Dist. No. 14J*, 208 F.3d 736 (9th Cir. 2000). A "material fact" is a fact "that might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Where reasonable minds could differ on the material facts at issue, summary judgment is not appropriate. *See v. Durang*, 711 F.2d 141, 143 (9th Cir. 1983). A dispute regarding a material fact is considered genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Liberty Lobby*, 477 U.S. at 248. However, the mere existence of a scintilla of evidence in support of the nonmoving party's position will be insufficient to establish a genuine dispute; there must be evidence on which the jury could reasonably find for the nonmoving party. *See id*. at 252.

Where, as here, the parties filed cross-motions for summary judgment on the same claims, the court must consider each party's motion separately and on its own merits, "giving the non-moving party in each instance the benefit of all reasonable inferences." *A.C.L.U. of Nev. v. City of Las Vegas*, 466 F.3d 784, 790–91 (9th Cir. 2006). Further, in evaluating the motions, "the court must consider each party's evidence, regardless under which motion the evidence is offered." *Las Vegas Sands, LLC v. Nehme*, 632 F.3d 526, 532 (9th Cir. 2011). *See also Fair Hous. Council of Riverside County, Inc. v. Riverside Two*, 249 F.3d 1132, 1134 (9th Cir. 2001) ("[T]he court must consider the appropriate evidentiary material identified and submitted in support of both motions, and opposition to both motions, before ruling on each of them.").

### III. Discussion

In its complaint, FOA has alleged claims for violations of the APA, WHBA, and NEPA. (ECF No. 1). WHBA and NEPA claims are reviewed under the same judicial review provisions as claims brought directly under the APA. *See* 5 U.S.C. § 706. Thus, all of the claims in this action are governed by the APA.

///

Under the APA, a federal court "shall … hold unlawful and set aside agency action, findings, and conclusions found to be … arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). *See also Or. Natural Res. Council Fund v. Brong*, 492 F.3d 1120, 1124–25 (9th Cir. 2007). Review under the APA's arbitrary and capricious standard is narrow. *Lands Council v. McNair*, 537 F.3d 981, 987 (9th Cir. 2008). Under the arbitrary and capricious standard, the court may set aside an agency's action as unlawfully arbitrary and capricious only if: (1) the agency entirely failed to consider an important aspect of a problem before reaching its decision; (2) the agency offered an explanation for its decision that is contrary to the evidence before the agency; (3) the agency's decision was so implausible that it could not be ascribed to a difference in view or be the product of agency expertise; or (4) the agency's decision was contrary to governing law. *Organized Vill. of Kake v. U.S. Dep't. of Agric.*, 795 F.3d 956, 966 (9th Cir. 2015).

The APA's arbitrary and capricious standard is necessarily deferential. *Motor Vehicle Mfrs. Ass'n. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). In evaluating an agency's decision, a court "is not empowered to substitute its judgment for that of the agency." *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971). Rather, the court reviews the agency action only to see if the agency "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action," *Motor Vehicle Mfrs. Ass'n.*, 463 U.S. at 43, and if the agency presented a "rational connection between the facts found and the conclusions made" in the agency's decision, *Brong*, 492 F.3d at 1125.

In deciding whether to grant summary judgment on an APA challenge, the district court "is not required to resolve any facts." *Occidental Eng'g Co. v. INS*, 753 F.2d 766, 769 (9th Cir. 1985). Instead, the court simply determines "whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did." *Id.*

///

///

///

///

**A. Violation of the APA (Claim 1)**

FOA's first cause of action alleges that defendants violated the APA by departing from BLM's own internal regulations and agency policy, namely BLM's own handbook governing wild horse management,[9] in approving the 2017 Gather Plan. (ECF No. 1).

In its motion for summary judgment, FOA argues that the 2017 Gather Plan, which allows for the gathering of wild horses over a ten-year period, violates several provisions within the wild horse handbook, and thus, violates the APA. (ECF No. 21). In particular, FOA argues that under the 2017 Gather Plan, BLM will not be drafting separate EAs for each roundup approved under the plan, will not be issuing separate decision records within the requisite time period before each roundup, and will not be providing a new public comment period before each roundup as required by the handbook. As such, FOA asserts that the 2017 Gather Plan is arbitrary and capricious and should be set aside.[10]

The Court has reviewed the documents on file in this matter and finds that defendants are entitled to summary judgment on FOA's first cause of action for violation of the APA. A District Court "will review an agency's alleged noncompliance with an agency pronouncement only if that pronouncement actually has the force and effect of law." *W. Radio Servs. Co., Inc. v. Espy*, 79 F.3d 986, 900 (9th Cir. 1996) (citing *U.S. v. Fifty-Three (53) Eclectus Parrots ("Fifty-Three Parrots")*, 685 F.2d 1131, 1136 (9th Cir. 1982)). Even so, a court "will not review allegations of

---

[9] It is undisputed that BLM issued a handbook for the management of wild horses known as the Wild Horses and Burros Management Handbook, BLM Handbook H-47001-1. (AR at 14986–15065). Part of the handbook addresses BLM's statutory duty under the WHBA to make excess determinations and remove excess wild horses from public land. In making an excess determination, the BLM handbook identifies seven factors BLM should analyze in its decision including: (1) grazing utilization and distribution on an HMA; (2) the ecological condition and ecological trend in an HMA; (3) actual use of the HMA by a wild horse population; (4) relevant climate data; (5) the current population inventory of wild horses in an HMA; (6) the presence of wild horses outside the HMA; and (7) other factors such as the results of land health assessments which demonstrate removal is needed to restore or maintain the range in a thriving, natural ecological balance. (*See* AR at 15016) (listing relevant factors). The handbook further provides that BLM should only issue gather decisions thirty-one to seventy-six days before the proposed gather to allow for public comment and that an EA should accompany each proposed gather. (AR at 15033).

[10] In its motion for summary judgment, FOA also argues that the 2017 Gather Plan is arbitrary and capricious because it was approved in violation of certain land use plans governing the Antelope and Triple B Complexes. (ECF No. 21). FOA did not plead or allege this claim in its complaint. (ECF No. 1, ¶111-115) (identifying the various alleged BLM policy violations). Claims cannot be raised for the first time in summary judgment proceedings. As such, FOA's newly raised APA claim for violation of certain land use plans shall not be considered by the court.

noncompliance with an agency statement that is not binding on the agency." *Id*. To determine whether an agency handbook has the independent force of law sufficient to trigger alleged noncompliance review by a District Court, "the agency pronouncement must (1) prescribe substantive rules – not interpretive rules, general statements of policy or rules of agency organization, procedure or practice – and (2) conform to certain procedural requirements." *Id*. at 901 (citing *Fifty-Three Parrots*, 685 F.2d at 1136). To satisfy the first requirement, the rule must be legislative in nature, affecting individual rights and obligations; to satisfy the second, it must have been promulgated pursuant to a specific statutory grant of authority and in conformance with procedural requirements imposed by Congress. *Id*.

Here, BLM's wild horse handbook does not meet either of these requirements. First, the handbook's pronouncements and guidance for wild horse excess determinations and removal gathers are not substantive in nature and do not create legal duties upon BLM. *See e.g., Colo. Wild Horse & Burro Coal. v. Jewell*, 130 F. Supp.3d 205, 214 (D. D.C. 2015) (holding that provision of the BLM's wild horse handbook requiring population inventories every two years did not create "a legal duty" for BLM). Second, the handbook was not promulgated in accordance with the necessary formal procedural requirements because the handbook was not published in the Federal Register or the Code of Federal Regulations, nor was the handbook subject to public notice and comment before being issued by BLM. As such, the wild horse handbook does not have the independent force and effect of law sufficient to bind BLM to its stated pronouncements for purposes of an APA claim. *See W. Radio Servs., Inc.*, 79 F.3d at 901. *See also Forest Guardians v. Animal & Plant Health Inspection Serv.*, 309 F.3d 1141, 1143 (9th Cir. 2002) (holding that an agency manual "does not have the force of law and does not bind the agency.")

The court's finding is consistent with and supported by the District of Oregon's recent decision in *Friends of Animals v. Bureau of Land Management*, 2018 WL 1612836 (D. Or. Apr. 2, 2018). In that case, FOA challenged the APA BLM's decision to remove wild horses from an HMA on the basis that the BLM did not comply with its wild horse handbook in effectuating the removal gather. *Id.* at *17–18. The Oregon District Court ultimately held that BLM was not required to strictly comply with its handbook because the handbook did not carry the "independent

force and effect of law," and thus, BLM's proposed gather action did not violate the APA. *Id*. at *18. Accordingly, the Court shall deny FOA's motion for summary judgment and grant defendants' cross-motion for summary judgment on this claim.

### B. Violation of the WHBA (Claim 2)

The Wild Free-Roaming Horses and Burros Act directs BLM to manage wild horse populations throughout the United States "to achieve and maintain a thriving natural ecological balance on the public lands." 16 U.S.C. § 1333(a). As part of the mandate, the WHBA requires BLM to compile and maintain "current inventor[ies] of wild horses and burros on given areas of public lands." 16 U.S.C. § 1333(b)(1); 43 C.F.R. § 4710.2. These inventories are then used to determine whether a wild horse population exceeds the AML for a designated HMA. *See* 16 U.S.C. § 1333(b)(2). If an overpopulation of wild horses exists, the WHBA further mandates that BLM remove the "excess" wild horses from public land. *Id*. "Where a given wild horse or burro population exceeds its designated AML, BLM must decide whether to bring the herd back within AML 'by the removal or destruction of excess animals, or other options (such as sterilization, or natural controls on population levels).' " *W. Rangeland Conservation Assoc. v. Zinke*, 265 F.Supp.3d 1267, 1274 (D. Utah 2017) (citing 16 U.S.C. § 1333(b)(1)). In evaluating a challenge to a BLM excess determination and gather plan under the WHBA, the important question for the court "is whether BLM followed the applicable WHBA regulations and otherwise properly made an excess determination." *Friends of Animals v. Bureau of Land Management*, 2018 WL 1612836, at *18 (D. Or. Apr. 2, 2018).

In its second cause of action, FOA alleges that defendants violated the WHBA when they made their initial determination that there were excess wild horses on the Antelope and Triple B Complexes and subsequently approved the 2017 Gather Plan based upon that erroneous excess determination. (ECF No. 1). In its motion for summary judgment, FOA raises three distinct arguments as to why defendants allegedly violated the WHBA. First, FOA argues defendants' excess determination that an overpopulation of wild horses currently exists, and will continue to exist, in the Antelope and Triple B Complexes throughout the duration of the 2017 Gather Plan was not based on "current information" as required by the WHBA. Second, FOA argues

defendants erroneously relied on outdated AMLs for the Antelope and Triple B Complexes in both the excess determination and the 2017 Gather Plan. Finally, FOA argues that the 2017 Gather Plan does not constitute management of wild horses at the "minimal feasible level" as required under the WHBA. The Court shall address each argument below.

### 1. "Current Information"

FOA contends that defendants' 2017 decision approving a ten-year gather plan was not based on "current information" for future roundups authorized under the 2017 Gather Plan. (ECF No. 21). In particular, FOA contends that the WHBA requires that every wild horse "excess" determination and subsequent round up of wild horses be based on current information. *See* 16 U.S.C. § 1333(b)(1). It argues that defendants did not have the required information in December 2017 when they approved the 2017 Gather Plan, which stated that removal of wild horses from the Antelope and Triple B Complexes will still be necessary ten years from now as range conditions and wild horse populations can fluctuate over such a long period. Further, FOA insists that defendants cannot act on the basis of current wild horse population inventories and information in approving a ten-year gather plan. Nevertheless, defendants approved Alternative A of the 2017 Gather Plan, which authorizes an undetermined number of roundups throughout the Antelope and Triple B Complexes over the next ten years. As such, FOA argues the 2017 Gather Plan, which authorizes round ups until 2027, is arbitrary and capricious.

Initially, the Court notes that FOA's argument is premised on a fundamental misunderstanding and misinterpretation of the WHBA's excess determination requirements. FOA mischaracterizes the plain language of the WHBA to require BLM to make a new excess determination for each and every round up authorized under a gather plan and base that new excess determination on information then available at the time of that particular round up. Such an interpretation of the WHBA is in direct conflict with the specific language of the statute which "entitles BLM to act 'on the basis of all information currently available to [it]' " in making its excess determination. *Colorado Wild Horse v. Jewell*, 130 F.Supp.3d 205, 214 (D. D.C. 2015) (citing 16 U.S.C. § 1333(b)(2)). *See also Am. Horse Protection Ass'n, Inc. v. Watt*, 694 F.2d 1310, 1318 (D. D.C. 1982) (holding that the WHBA specifically authorizes BLM to act "on the bases of

whatever information [it] has at the time of [its] decision."). Contrary to FOA's argument, the WHBA contemplates a single excess determination prior to approval of a gather plan. There is no requirement that a separate determination be made for each individual round up approved under a gather plan and the court shall not read such a requirement into the WHBA. *See e.g., Friends of Animals v. Bureau of Land Management*, 232 F.Supp.3d 53, 63 (D. D.C. 2017) (holding that FOA's argument that BLM must issue an EA or other document "for every individual gather … reads too much into BLM's" statutory duties).

Second, the Court finds that defendants' determination that there were excess wild horses on the Antelope and Triple B Complexes was based on the information available to them at the time of their decision in December 2017, and thus, their decision did not violate the WHBA. Prior to drafting the 2017 Gather Plan, defendants compiled substantial data regarding the utilization of forage and water by all animals throughout the Antelope and Triple B Complexes as well as trends in ecological conditions and climate patterns. (AR at 58–64). The data defendants compiled and then relied upon in their decision included information about current wild horse populations (based on inventories in 2016 and 2017), current livestock grazing in the complexes, and ecological and climate trends in the complexes. *Id.* Additionally, defendants compiled several monitoring and utilization reports in 2017 which provided the most current information about HMA conditions. (AR at 26503–27411). After considering this information, defendants concluded that "[w]ild horse population and resource monitoring data shows that current wild horse populations are exceeding the range's ability to sustain them." (AR at 369). The Court finds that the information defendants compiled and relied upon in support of the 2017 Gather Plan complied with the WHBA's mandate that BLM act "on the basis of all information currently available to [it.]" 16 U.S.C. § 1333(b)(2).

Finally, FOA's argument fails in light of the widely accepted understanding that the WHBA "conveys Congress's view that BLM's findings of wild horse overpopulations should not be overturned quickly on the ground that they are predicated on insufficient information." *Am. Horse Protection Ass'n*, 694 F.2d at 1318. *See also In Def. of Animals*, 751 F.3d at 1066 (finding that agency expertise deserves deference when an overpopulation exists and action is warranted). FOA's challenge to the 2017 Gather Plan essentially boils down to requiring that BLM act only

upon perfect and up to date information at all times of a gather plan. Perfect information, however, is almost never available when predicting future environmental factors and effects. Moreover, such information is not required under the WHBA before BLM issues a decision pursuant to its statutory mandate. Therefore, the Court finds that defendants' excess determination under the WHBA and subsequent removal plan as outlined in Alternative A of the 2017 Gather Plan was not arbitrary and capricious.

### 2. Reliance on Outdated AMLs

FOA also argues that the 2017 Gather Plan is arbitrary and capricious because it is based in part on outdated AMLs for several of the HMAs within the Antelope and Triple B Complexes that BLM had previously committed to reevaluate. (ECF No. 21). In particular, FOA contends that several AMLs and land use plans in a few HMAs will not be valid for the life of the 2017 Gather Plan without being reevaluated pursuant to the terms of the relevant land use plans, and thus, defendants could not rely on these AMLs to support the 2017 Gather Plan. In opposition, defendants argue that their reliance on the previously approved AMLs was not a violation of the WHBA. (ECF No. 27).

The Court agrees with defendants. There is no language in the WHBA "requir[ing] the BLM to determine new AMLs based on current conditions every time the BLM decides to take action to restore the already-established AMLs." *In Def. of Animals*, 751 F.3d at 1064, n. 13. *See also Friends of Animals v. Bureau of Land Management*, 2018 WL 1612836, at *18 (D. Or. Apr. 2, 2018) ("FOA provides, and the Court has found, no case law to support FOA's contention that BLM has an obligation to show that the AML 'applies' or remains valid in a given HMA before relying on it[.]"). In fact, notwithstanding FOA's argument to the contrary, the WHBA "does not create a statutory obligation for BLM to recalculate the AML at every gather." *Friends of Animals*, 2018 WL 1612836, at *18. Instead, BLM is given great deference both in establishing AMLs and in reevaluating established AMLs. *See Habitat for Horses v. Salazar*, 745 F.Supp.2d 438, 453 (S.D.N.Y. 2010).

Furthermore, re-evaluation of an AML is a time-consuming process requiring ongoing monitoring and activity by BLM. Under the WHBA, BLM is mandated to "immediately remove

excess wild horses from the range so as to achieve [AMLs]." 16 U.S.C. § 1333(b)(2). It would run counter to the WHBA's statutory mandate to reevaluate an established AML prior to every removal decision. Thus, while the AMLs relied on in the 2017 Gather Plan have not been amended in the past few years, these AMLs are the currently applicable and established AMLs for the project area and BLM was required to rely on them in support of its excess determination. *In Def. of Animals*, 751 F.3d at 1064, n. 13. Therefore, BLM's reliance on the previously approved and established AMLs was not arbitrary and capricious.

### 3. Minimally Feasible Level

Finally, FOA argues that the 2017 Gather Plan violates the WHBA because managing a portion of the wild horse population as castrated/gelded horses does not constitute management at the minimal feasible level as required under the WHBA's provisions. (ECF No. 21).

As an initial matter, FOA failed to plead or otherwise raise this WHBA claim in its complaint, and it cannot now pursue the claim on summary judgment. As pled in its complaint, FOA's WHBA claim only challenged the 2017 Gather Plan's excess and removal determinations. (ECF No. 1, ¶ 117) ("On the above facts and legal obligations, Defendants violated the WHBA by failing to make an appropriate determination that wild horses were excess and removal is necessary prior to authorizing the permanent removal of horses over a ten-year period from the Antelope and Triple B Complexes."). Nowhere in this claim did FOA challenge the 2017 Gather Plan's proposal of returning a portion of geldings under the "minimal feasible language" of the WHBA. Rather, FOA challenged the return of geldings to the Antelope and Triple B Complexes under NEPA, as alleged in FOA's third and fifth cause of action. (ECF No. 1). Therefore, the court shall dismiss this newly raised claim with prejudice.

But even if FOA had pled this claim in its complaint, the Court finds that defendants' decision to utilize population control measures, including gelding of stallions, a portion of which are then returned back to the Antelope and Triple B Complexes, reasonably constitutes management of wild horses at the minimal feasible level and therefore was not arbitrary and capricious. *See In Def. of Animals*, 751 F.3d at 1057-59 (finding that applying population control measures was management at the minimal feasible level). The only difference between past gather

plans and the 2017 Gather Plan is that some geldings would be released back to the Antelope and Triple B Complexes instead of being shipped off for adoption or sale. Under the WHBA, BLM has explicit authority to utilize a range of population control measures, in addition to directly removing and euthanizing excess horses, to manage wild horse populations to reach an established AML range. *W. Rangeland Conservation Assoc.*, 265 F.Supp.3d at 1274.

FOA reads far more into the phrase "minimal feasible level" than the statute permits. The WHBA's requirement that "[a]ll management activities shall be at the minimal feasible level," 16 U.S.C. § 1333(a), can reasonably be read and interpreted, as BLM interprets the statute, to mean that BLM shall use "[t]he minimum number of habitat or population management tools or actions necessary to attain the objectives" for an HMA. The 2017 Gather Plan complies with this interpretation, as returning horses that would already be gelded back to the range does not increase the number of population management actions that BLM must take, and gelding provides a permanent way to render part of the herd non-reproducing. FOA's argument improperly reads NEPA requirements into the WHBA, suggesting that the WHBA provision does not permit "controversial" management actions or actions that have not been thoroughly studied. Such an interpretation is beyond the plain meaning of the WHBA. Because BLM's interpretation of the statute is reasonable and faithful to the plain meaning of the statutory terms of the WHBA, it shall not be rejected by the Court in favor of FOA's broad and baseless alternative. FOA has not established that defendants' gelding proposal would add additional material management actions to those otherwise planned by BLM. In fact, FOA has failed to identify any specific managerial conduct or intrusive action because of the gelding proposal that is not already identified in the 2017 Gather Plan for the other population control measures and BLMs monitoring of wild horse populations in general. Thus, contrary to FOA's unsubstantiated claims, managing a portion of the wild horse population as non-breeding geldings does not violate WHBA's requirement for management at the minimum feasible level. Accordingly, the court shall deny FOA's motion for summary judgment and grant defendants' cross-motion for summary judgment on the entirety of FOA's second cause of action for violation of the WHBA.

///

## C. Violation of NEPA – EIS (Claim 3)

FOA's third cause of action alleges that defendants' failure to prepare an Environmental Impact Statement prior to approving the 2017 Gather Plan violates NEPA. (ECF No. 1).

The National Environmental Policy Act is Congress' basic "national charter for protection of the environment." *Ctr. for Biological Diversity v. U.S. Forest Serv.*, 349 F.3d 1157, 1166 (9th Cir. 2003). NEPA serves two fundamental purposes: (1) to require agencies to consider detailed information concerning significant environmental impacts of a proposed action; and (2) to inform the public that an agency has considered the environmental impacts in its decision-making process while ensuring that the public can access and contribute to the decision-making process via comments. *Robertson v. Methow Valley Citizens Council*, 490 U.S. 322, 349 (1989); *San Luis Obispo Mothers for Peace v. Nuclear Regulatory Comm'n*, 449 F.3d 1016, 1034 (9th Cir. 2006). NEPA does not impose any direction or restriction on the ultimate action of an agency. *Hillsdale Envtl. Loss Prev. v. U.S. Army of Engineers*, 702 F.3d 1156, 1166 (10th Cir. 2012). Instead, "NEPA imposes procedural, information-gathering requirements on an agency[.]" *Id.*

To meet the goals of NEPA, an agency must prepare an EIS for any major federal action "significantly affecting the quality of the human environment."[11] 42 U.S.C. § 4332(2)(C). An EIS is a formal statement outlining and identifying "the environmental impacts of the proposed action, any adverse environmental effects which cannot be avoided should the proposal be implemented, [and] alternatives to the proposed action." 42 U.S.C. § 4332(2)(C)(i)-(iii). Prior to preparing a formal EIS, an agency first prepares an Environmental Assessment to determine whether the agency's proposed action actually requires the preparation of a formal EIS, or instead simply warrants a FONSI. 40 C.F.R. § 1501.4; *Friends of Animals v. Sparks*, 200 F.Supp.3d 1114, 1119 (D. Mont. 2016) (recognizing that BLM regularly prepares an EA to evaluate potential environmental impacts of a proposed plan before conducting wild horse gathers).

---

[11] The term "human environment" has been "interpreted comprehensively to include the natural and physical environment and the relationship of people with that environment." 40 C.F.R. § 1508.14. "In the context of wild horse gathers, [courts have] interpreted 'human environment' to encompass 'not solely [the environmental impact] on the rangelands, but [the environmental impact] on the horses as well.'" *In Def. of Animals*, 751 F.3d at 1068, n. 22 (quoting *Am. Horse Protection Ass'n v. Andrus*, 608 F.2d 811, 814 (9th Cir. 1979)).

In contrast to a formal EIS, an EA is a "concise public document" that "[b]rielfy provide[s] sufficient evidence and analysis for determining whether to prepare an [EIS]." *Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 757 (2004). In drafting an EA, NEPA does not impose substantive obligations upon an agency; rather NEPA simply requires that an agency take a "hard look" at the environmental consequences of its decision-making. *Robertson*, 409 U.S. at 350; *Friends of Animals v. Bureau of Land Management*, 2018 WL 1612836, at *11 (D. Or. Apr. 2, 2018) ("Thus, the Ninth Circuit has affirmed that the important question is whether the agency has taken a 'hard look' at the environmental impacts of a proposed action."). This hard look includes determining whether the agency adequately evaluated all potential environmental impacts of the proposed action, analyzed all reasonable alternatives to the proposed action, and identified and disclosed to the public all foreseeable impacts of the proposed action. *See* 42 U.S.C § 4332(2)(C). If, after completion of an EA, "an agency determines that the contemplated federal action will not significantly affect the environment, 'the federal action may issue a finding of no significant impact … in lieu of preparing an EIS.'" *Friends of Animals*, 2018 WL 1612823, at *2 (quoting *Native Ecosystems Council v. Tidwell*, 599 F.3d 926, 937 (9th Cir. 2010)).

In reviewing a decision not to prepare an EIS under NEPA, the court "employ[s] an arbitrary and capricious standard that requires [the court] to determine whether the agency has taken a 'hard look' at the consequences of its actions, based [its decision] on a consideration of the relevant factors, and provided a convincing statement of reasons to explain why a project's impacts are insignificant.'" *In Def. of Animals*, 751 F.3d at 1068 (citing *Envtl. Prot. Info. Ctr. v. U.S. Forest Serv. ("EPIC"),* 451 F.3d 1005, 1009 (9th Cir. 2006)). Generally, "[a]gencies consider two broad factors to determine whether an action may 'significantly affect' the environment[:] 'context' and 'intensity.'" *Id.* (citing 40 C.F.R. § 1508.27). "Context simply delimits the scope of the agency's action, including the interest affected." *Id.* (quoting *National Parks & Conservation Ass'n v. Babbitt*, 241 F.3d 722, 731 (9th Cir. 2001)). "Intensity refers to the 'severity of impact,' and the

regulations identify ten factors that agencies should consider in evaluating intensity." *Id.* (citing 40 C.F.R. § 1508.27(b)(1)-(10) (listing factors)).[12]

If substantial questions are raised as to whether a proposed project "may cause significant degradation of some human environmental factor" then a formal EIS is required before approval of the agency action. *Pub. Citizen v. Nuclear Regulatory Comm'n*, 573 F.3d 916, 929 (9th Cir. 2009). An action is "highly controversial" when "a substantial dispute exists as to the size, nature, or effect of the major federal action[.]" *Human Soc'y of the U.S. v. Locke*, 626 F.3d 1040, 1047 (9th Cir. 2010). "A substantial dispute exists when evidence … casts serious doubt upon the reasonableness of the agency's conclusions." *Babbitt*, 241 F.3d at 736. In making this assessment, a court must not substitute its judgment for that of the agency. *Okanogan Highlands Alliance v. Williams*, 236 F.3d 468, 473 (9th Cir. 2000).

In its motion, FOA argues that the ultimate environmental effects of the 2017 Gather Plan are "highly controversial" and thus, defendants were required to prepare an EIS prior to approving the gather. As such, defendants' approval of the gather plan absent an EIS violates NEPA and was an arbitrary and capricious decision. FOA raises several challenges to the 2017 Gather Plan which it argues establishes that the gather plan is highly controversial.

First, FOA argues that a change to the boundary area between the preliminary gather plan, which identified a gather area of over 3 million acres, and the approved 2017 Gather Plan, which identifies a gather area of 2.8 million acres, establishes that there is a substantial dispute as to the size of the gather. (ECF No. 21). FOA's argument is without merit. It is undisputed that in the preliminary gather plan EA, BLM identified that the prospective gather area was over 3 million

---

[12] The intensity factors enumerated by 40 C.F.R. § 1508.27(b) include: (1) impacts that may be both beneficial and adverse; (2) the degree to which the proposed action affects public health or safety; (3) unique characteristics of the geographic area such as proximity to historic or cultural resources, park lands, prime farmlands, wetlands, wild and scenic rivers, or ecologically critical areas; (4) the degree to which the effects on the quality of the human environment are likely to be highly controversial; (5) the degree to which the possible effects on the human environment are highly uncertain or involve unique or unknown risks; (6) the degree to which the action may establish a precedent for future actions; (7) whether the action is related to other actions with individually insignificant but cumulatively significant impacts; (8) the degree to which the action may adversely affect districts, sites, highways, structures, or objects listed in or eligible for listing in the National Register of Historic Places or may cause loss or destruction of significant scientific, cultural, or historical resources; (9) the degree to which the action may adversely affect an endangered or threatened species or its habitat; and (10) whether the action threatens a violation of Federal, State, or local law.

acres. Then in response to a public comment that the acreage figures used in the preliminary gather plan EA were higher than the established acreage in the HMAs and land use plans for the Antelope and Triple B Complexes, BLM reviewed the record for each HMA and concluded that the boundaries of four HMAs had been incorrectly measured and incorporated into the preliminary gather EA. BLM then corrected the gather acreage in the 2017 Gather Plan to reflect the actual acreage and boundaries for each HMA as established in the governing land use plans and explained the reason for the boundary change. (AR at 351–364). More importantly, BLM directly analyzed the relevant environmental concerns when the error occurred including the effect of the boundary change on each HMA's AML range and the effect the proposed action would have on the AMLs under the correct boundaries. (AR at 351) ("Even if the slightly higher acreage value given for [the HMAs] at the time the AMLs were established resulted in proportionally higher AMLs for those HMAs, this would not affect the proposed action and gather plan described in the Final EA."). Because BLM did not change the acreage in the governing land use plans, BLM is not required to re-analyze issues previously addressed in its land use plan NEPA analysis. The Court finds that this boundary change, which is reflected in the administrative record, is not highly controversial, nor does it raise substantial questions about the proposed action to trigger an EIS.

Second, FOA asserts that the 2017 Gather Plan's proposed use of gelding and other fertility controls to limit population growth in the Antelope and Triple B Complexes is highly controversial because these procedures involve unique risks to the health of the wild horse populations. In particular, FOA contends that BLM's decision to release geldings back into the complexes as a management tool is untested and not scientifically supported. FOA argues that several wild horse experts who submitted comments during the public comment period expressed their concern that castrating wild horses will affect the "fundamental process" of wild horse behavior (AR at 1396), will cause undue suffering to the gelded horses (AR at 821), and will "destroy" the social dynamics of wild horse herds (AR at 877–881). Thus, because there is no definitive scientific consensus on the impact of managing castrated stallions within existing wild horse herds, FOA argues that an EIS should have been prepared prior to approval of the 2017 Gather Plan.

///

In opposition, defendants argue that the 2017 Gather Plan's use of geldings and fertility controls is not highly controversial and does not involve highly uncertain or unique risks. (ECF No. 27). The court agrees. Initially, the court finds that FOA fails to demonstrate that the effects of the proposed population controls are highly controversial, highly uncertain, or involve unique or unknown risks for purposes of NEPA. *See Ctr. for Biological Diversity v. Kempthorne*, 588 F.3d 701, 712 (9th Cir. 2009) (holding that for an action's effects to be "highly uncertain" there must be more than just "some uncertainty" about the proposed action). Even granting that this will be the largest and longest gather action conducted in the Antelope and Triple B Complexes, the 2017 Gather Plan's foreseeable effects are entirely precedential and non-controversial: the return of the wild horse population to the long-established AMLs. Achieving and maintaining established AMLs through a combination of both permanent removal of wild horses and other population control methods is a routine practice of BLM. In fact, it has been a long-standing practice of BLM to use both fertility controls (including injecting immunocontraceptives into mares) and the skewing of the stallion-to-mare ration to achieve a specific wild horse population sex ratio since at least 1992, and the comments on the preliminary gather plan and FOA's arguments to the contrary do not indicate that these practices are "highly controversial." Further, at least one sister court of this district has held that use of fertility controls was not "highly controversial" back in 2011, and thus, did not require an EIS as a matter of law. *See Cloud Foundation v. BLM*, 802 F. Supp. 2d 1192 (D. Nev. 2011). Moreover, FOA has not presented any evidence that "casts serious doubt" upon the reasonableness of BLM's conclusions, and thus the court finds that the effects of those actions were not highly controversial at the time BLM issued the FONSI. *See Locke*, 626 F.3d at 1057.

Similarly, the record does not establish any substantial dispute or high uncertainty over the management effects of releasing geldings into the complexes that would require an EIS. Gelding horses is hardly a new process and is a common surgical procedure used by BLM. (AR at 24) ("BLM routinely gelds all excess male horses that are captured and removed from the range prior to their adoption, sale, or shipment to off-range holding facilities."). And although there is some uncertainty about gelding behavior in the wild compared to gelding behavior as adopted horses,

that uncertainty alone does not warrant an EIS. *See Kempthorne*, 588 F.3d at 712. And, in contrast to FOA's argument, defendants detailed the possible effects and impacts of releasing gelded stallions back into the complexes. (AR at 25) ("Management of a gelding population would allow management at mid-AML, instead of gathering and removing excess animals at low AML"), (AR at 152) (noting that "castration is thought to increase survival as males are released from the cost or reproduction;" and that "there is absolutely no evidence based on available research or observation that would suggest that a gelded wild horse would have its movements hindered or would become docile or obedient simply as a result of castration."). In fact, defendants spent fourteen pages of the 2017 Gather Plan addressing the effects of releasing geldings back into the wild. (AR at 141–54).

Third, FOA argues that defendants' decision to remove 95 percent of wild horses from the public lands will substantially destroy a historic and cultural resource. This argument is also without merit. FOA's allegations that the proposed action may have a significant impact on cultural and historical resources, specifically wild horses, is unsupported and contrary to NEPA. In fact, the WHBA does not describe or define wild horses as cultural resources, and defendants' similar statement in the 2017 Gather Plan was not in error. (AR at 310–11) ("Research regarding the wild horse as part of the historic cultural landscape revealed that wild horses are not discussed in historic and pioneer journals, indicating their presence and impact on the [historic] environment . . . was minimal, if present at all.").

Fourth, FOA argues that the nearly 5,000 public comments that BLM received on the preliminary gather plan indicates that the plan is highly controversial and that an EIS was required. But the fact that BLM received 4,490 comments during the public notice and comment period does not make the action "significant." Notably, 97 percent of the comments received were form letters generally opposing the plan. Moreover, the number of total public comments is irrelevant. *See Native Ecosystems Council v. U.S. Forest Serv.*, 428 F.3d 1233, 1240 (9th Cir. 2005) (stating that the mere "existence of opposition to a proposed agency action does not render that action 'highly controversial.'").

///

Finally, FOA claims that the gather will improperly establish a precedent for future actions by encouraging future roundups of this scope and intensity. This argument, however, is foreclosed by Ninth Circuit precedent which holds that EAs are "highly specific to the project and the locale, thus creating no binding precedent" for future actions. *Barnes v. U.S. Dep't of Transp.*, 655 F.3d 1124, 1140 (9th Cir. 2011).

Based on all the above, the Court concludes that BLM considered the relevant intensity factors prior to issuing its FONSI and provided a reasonable and convincing statement of reasons explaining why the 2017 Gather Plan's environmental impacts were expected to be insignificant, and that an EIS was not required. *See e.g., S. Union Co. v. Sw. Gas Corp.,* 415 F.3d 1001, 1009 (9th Cir. 2005). Therefore, defendants' decision to not prepare an EIS prior to approval of the 2017 Gather Plan was not arbitrary and capricious. Accordingly, the Court shall deny FOA's motion for summary judgment and grant defendants' cross-motion for summary judgment on FOA's third cause of action for violation of NEPA.

### D. Violation of NEPA – Reasonable Alternatives (Claim 4)

"NEPA requires agencies to explore reasonable alternatives to a proposed action and to briefly discuss the reasons other alternatives were eliminated from detailed consideration." *Friends of Animals v. Bureau of Land Management*, 2018 WL 1612836, at *4 (D. Or. Apr. 2, 2018) (citing 40 C.F.R. § 1502.14(a)). The "purpose and need" of an agency's project determine the appropriate range of such alternatives. 40 C.F.R. § 1502.13. In the 2017 Gather Plan, the project purpose is identified as the need "to prevent undue or unnecessary degradation of the public lands associated with excess wild horses, to restore a thriving natural ecological balance and multiple-use relationship on public lands, consistent with the provision of Section 1333(b) of the [WHBA]." (AR at 17). The Ninth Circuit affords agencies "considerable discretion to define the purpose and need of a project." *Friends of Se. Future v. Morrison*, 153 F.3d 1059, 1066 (9th Cir. 1998).

FOA's fourth cause of action alleges that defendants violated NEPA by failing to respond to public comments raised in response to the preliminary gather plan and to consider reasonable alternatives in the 2017 Gather Plan. In particular, FOA argues that defendants failed to consider the three alternatives FOA proposed in its public comment: (1) reevaluating current AMLs; (2)

using natural controls, including the protection of predators, to reduce wild horse populations; and (3) adjusting the forage allocated to cattle and sheep to provide more forage for wild horses.

When preparing an EA, agencies are only required to conduct brief discussions of reasonable, feasible alternatives that are reasonably related to the purpose of the project. *See Westlands Water Dist. v. U.S. Dep't of Interior*, 376 F.3d 853, 868 (9th Cir. 2004). *See also Native Ecosystems*, 428 F.3d at 1246 (stating that "an agency's obligation to consider alternatives under an EA is a lesser one than under an EIS."); *Cal. Trout v. F.E.R.C.*, 572 F.3d 1003, 1016 (9th Cir. 2009) (holding that "NEPA does not require federal agencies to 'assess … consider … [and] respond' to public comments on an EA to the same degree as it does for an EIS."). Agencies are not required to "consider alternatives which are infeasible, ineffective, or inconsistent with the basic policy objectives for the management of the area." *Headwaters, Inc. v. BLM*, 914 F.2d 1174, 1180 (9th Cir. 1990). Further, in rejecting any alternative, the agency must only include a brief discussion of the alternative, and the agency may reject it without a detailed discussion so long as the agency provided "an appropriate explanation …as to why [the alternative] was eliminated." *Native Ecosystems Council*, 428 F.3d at 1246. Further, so long as "reasonable alternatives' have been considered," there is no "minimum number of alternatives that an agency must consider." *Native Ecosystems Council*, 428 F.3d at 1246 (deeming sufficient the consideration of two alternatives including the no-action alternative).

Here, as addressed below, the Court finds that defendants have satisfied their obligations under NEPA to consider reasonable alternatives to the approved action, including the alternatives proposed by FOA. FOA's first proposed alternative was for BLM to re-evaluate all the AMLs in the Antelope and Triple B Complexes before approving a gather plan and conducting a wild horse gather. In its motion, FOA argues that re-evaluating the AMLs is a reasonable alternative to approved Alternative A of the 2017 Gather Plan. (ECF No. 21). The Court disagrees. Reevaluating and adjusting the AMLs throughout the Antelope and Triple B Complexes is outside the scope of the project's identified purpose and need of reducing wild horse population growth rates. FOA has failed to provide any support to show how a reevaluation and adjustment in AMLs would reduce the wild horse populations on the Antelope and Triple B Complexes or in any way promote the

health of existing wild horse populations. As such, BLM was not required to address this alternative as a matter of law. *See Headwaters, Inc.*, 914 F.2d at 1180. *See also Friends of the Earth v. Coleman*, 513 F.2d 295, 297-298 (9th Cir. 1975) (holding that "[t]his court has construed NEPA § 102(a)(C) as not requiring an agency to examine every conceivable alternative, but only those that are reasonable."). But BLM did address this proposal in the 2017 Gather Plan and concluded that "[m]onitoring data collected within the Complexes does not indicate that an increase in AML is warranted at this time," and in fact "confirms the need to remove excess wild horses." (AR at 34). Thus, despite not being required to even address this public comment and proposed alternative, defendants considered this alternative, but reasonably eliminated it from analysis as a viable alternative to Alternative A of the 2017 Gather Plan because it was contrary to the principles of the WHBA.

FOA's second proposed alternative was for BLM to manage the excess wild horse population in the Antelope and Triple B Complexes through natural means by protecting the wild horses' natural predators. (ECF No. 21). BLM also reasonably eliminated this proposal from further consideration as it clearly did not meet the purpose and need of the 2017 Gather Plan. In the 2017 Gather Plan, defendants concluded that wild horses in these complexes are not adequately regulated by predators, have high foal survival rates, and "do not self-regulate their population growth rate." (AR at 35). Defendants then concluded that management by natural means was not a reasonable alternative because it had not been feasible in the past as the major predators did not exist in the Antelope and Triple B Complexes and the alternative would result in less forage, poorer body condition, and decreased survival of wild horses. (AR at 35–6) (finding that "[t]his alternative would result in a steady increase in the wild horse populations which would continue to exceed the carrying capacity of the range resulting in a catastrophic mortality of wild horses in the complexes, and irreparable damage to rangeland resources."). Moreover, FOA's proposed alternative is contrary to BLM management objectives and various statutory and regulatory mandates because the WHBA requires BLM to prevent range deterioration and manage wild horses as "healthy animals." As FOA's proposed alternative of protecting predators would not

have met the purpose and need identified in the 2017 Gather Plan, the Court finds that defendants properly considered and eliminated it from consideration.

FOA's third and final proposed alternative was for BLM to reduce the number of cattle and sheep allowed to graze in the Antelope and Triple B Complexes to improve the range conditions. The Court likewise finds that defendants' elimination of this proposed alternative was not arbitrary and capricious. In the 2017 Gather Plan, defendants explained that this alternative would simply exchange a limited amount of current forage used by livestock for use by wild horses, which would not meet the purpose and need of the project to reduce wild horse growth rates; moreover, the proposed alternative would not conform to existing land use plans. (AR 34–5). Further, FOA's livestock alternative was outside the scope of the BLM's authority to manage wild horse populations under the WHBA because changes to livestock grazing allotments must be made through a separate process and not through wild horse gathers. Thus, this alternative was properly considered and eliminated.

Therefore, as addressed above, defendants reasonably addressed and adequately responded to FOA's proposed alternatives and FOA repeatedly ignores evidence in the record showing defendants gave due consideration to its proposed alternatives, even though the alternatives were outside the purpose and need of the 2017 Gather Plan. Accordingly, the court shall deny FOA's motion for summary judgment and grant defendants' cross-motion for summary judgment as to FOA's fourth cause of action for violation of NEPA.

### E. Violation of NEPA - Hard Look (Claim 5)

FOA's last cause of action alleges that defendants failed to take a "hard look" at the environmental impact of the approved 2017 Gather Plan as required by NEPA. (ECF No. 1). Specifically, FOA argues that defendants failed to take a hard look at the impact that releasing gelded/castrated wild horses will have on the behavior and physiology of wild horses, specific herd dynamics, and the genetic diversity of the herds. Further, FOA contends that members of the public and wild horse advocacy organizations submitted comments to defendants in response to the preliminary gather plan detailing multiple concerns from wild horse experts that castrating wild horses will have a significant impact on wild horses and strip them of their free-roaming behaviors.

Finally, FOA contends that removing 95 percent of the wild horses from the Antelope and Triple B Complexes will have an adverse impact on the genetic diversity of the horses and that defendants did not appropriately address this significant issue. Thus, FOA argues that defendants violated NEPA by failing to appropriately address these issues or examine FOA's presented information.

The Court has reviewed the documents and pleadings on file in this matter and finds that defendants did take the appropriate "hard look" at the impacts of the proposed gather plan to comply with NEPA. Initially, the Court notes that this challenge raises several of the same issues addressed in FOA's third cause of action for a violation of NEPA as it relates to the release of gelded wild horses back into the Antelope and Triple B Complexes. The Court's finding as to that claim are equally applicable to this claim, so the Court will not repeat its findings and conclusions here.

Additionally, the Court finds that BLM sufficiently analyzed possible effects and impacts to geldings based on currently available studies. BLM provided thorough and reasoned explanations, throughout the record, addressing the impact of the proposed action's gelding component based on current studies. (AR at 141–54). And as addressed above, BLM is not required to recite its assessment, consideration, and response to every comment on a EA. *See Native Ecosystems*, 428 F.3d at 1246. Contrary to FOA's allegation, the mere possibility of unknown effects by a proposed action does not render defendants' ultimate conclusion approving that action arbitrary and capricious. *See Kempthorne*, 588 F.3d at 712. Moreover, the fact that there are no field studies of gelded wild horse being returned to the range in the West is not a reason to discount the informed opinion of those with extensive background on wild horses. *N. Plains Res. Council, Inc. v. Surface Transp. Bd.*, 668 F.3d 1067, 1075 (9th Cir. 2011) (recognizing that "in reviewing scientific judgments and technical analyses within the agency's expertise," the court is generally "at its most deferential.").

The Court further finds that defendants complied with NEPA by taking a hard look at the characteristics of the geographic area, impact of returning geldings to the range, and genetic impacts of the wild horse gather. FOA may subjectively believe that defendants' chosen outcome harms wild horse populations, but FOA's subjective belief does not constituted a NEPA violation.

More importantly, FOA ignores the legal obligation that public ranges be managed for multiple uses, "not merely for the maximum protection of wild horses," and thus, some removal of wild horses and associated population controls is necessary to protect the livelihood of the herd. *Am. Horse Prot. Ass'n*, 694 F.2d at 1317.

In its motion, FOA argues defendants failed to analyze or consider the public comments, including studies submitted by Drs. Allen Rutberg, Bruce Nock, Jay Kirkpatrick, and Anne Perkins in approving the 2017 Gather Plan. The administrative record, however, establishes that defendants specifically considered and responded to comments from these alleged wild horse experts, noting that their opinions were speculative and not based on the commenter's own research. (AR at 288, 302–3). Further, BLM stated that the "opinions about behavioral effects of gelding by Drs. Rutberg, Nock, or Kirkpatrick are speculative, given that none of them has conducted a study on topic." (AR at 288). Moreover, the existence of differing opinions on the environmental impacts does not invalidate BLM's expertise and conclusions, which are supported by the Final EA's review of the existing literature on the effects of geldings, and they are entitled to deference by the Court. *N. Plains Res. Council, Inc.*, 668 F.3d at 1075.

Similarly, as to FOA's claim that defendants failed to take a hard look at the genetic diversity of the horses, including unique herd characteristics, the Court finds that defendants also appropriately addressed this issue in the 2017 Gather Plan. Initially, the Court recognizes that the Antelope and Triple B Complexes are governed as meta-populations meaning that wild horses interchange throughout the HMAs. (AR at 14161). This factor helps increase genetic diversity even in the face of overall lower wild horse populations. FOA completely neglects this fact in its argument, instead choosing to criticize defendants for removing horses from specific herd families. Moreover, the administrative record directly refutes FOA's claim that the proposed action will critically destroy the genetic health of the herds. The 2017 Gather Plan specifically analyzes and discusses the genetic health and potential impacts of approve gather on future wild horse populations. (AR at 146, 177). Moreover, no genetic report that defendants consulted concluded that genetic variability was at risk under the governing AML range for each HMA. Finally, the approved plan provides for and includes ongoing monitoring and other efforts to ensure that

genetic diversity remains in the complexes. (AR at 29) (stating that genetic health and herd characteristic date will continue to be monitored for the duration of the gather plan). Thus, the Court finds that defendants conclusion that the proposed action is not expected to affect the genetic health because "[a]vailable indications are that these populations contain high levels of genetic diversity at this time" and are likely to maintain that diversity is not arbitrary and capricious. (AR at 153). Accordingly, the Court shall deny FOA's motion for summary judgment and grant defendants' cross-motion on this issue.

IT IS THEREFORE ORDERED that plaintiff's motion for summary judgment (ECF No. 21) is DENIED.

IT IS FURTHER ORDERED that defendants' cross-motion for summary judgment (ECF No. 27) is GRANTED.

IT IS FURTHER ORDERED that the clerk of court shall enter judgment in favor of defendants the United States Bureau of Land Management and Jill Silvey and against plaintiff Friends of Animals in this action.

IT IS SO ORDERED.

DATED this 17th day of December, 2018.

_____
LARRY R. HICKS
UNITED STATES DISTRICT JUDGE